UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

STATE OF NEW YORK, *et al.*,

    Plaintiffs,

      v.

MICROSOFT CORPORATION,

    Defendant.

Civil Action No. 98-1233 (CKK)

---

**MEMORANDUM OPINION**[1]

(January 29, 2008)

Currently pending before the Court are the motions to extend the Final Judgments in this action filed by the California Movants and the New York Movants (collectively, the "Moving States").[2] The Final Judgments arise out of a single civil complaint filed by a group of state plaintiffs on May 18, 1998, alleging antitrust violations by Defendant Microsoft Corporation and asserting claims pursuant to federal and state law.[3] The two Final Judgments are premised upon

---

[1] An Executive Summary of this Memorandum Opinion, which does not represent the official and complete Court findings of fact or conclusions of law, is available on the public docket for this case.

[2] The California Movants include the States of California, Connecticut, Iowa, Kansas, Minnesota, the Commonwealth of Massachusetts, and the District of Columbia. *See* Plaintiff States' Memorandum of Points and Authorities in Support of their Motion to Extend the Final Judgment Until November 12, 2012 (hereinafter "CA Mem.") at 1. The New York Movants include the States of New York, Maryland, Louisiana and Florida. *See* Joinder of Plaintiff States of New York, Maryland, Louisiana and Florida in Moving to Extend the Final Judgments (hereinafter "NY Mem.") at 1. As detailed below, the California Movants and New York Movants each belong to larger groups of state plaintiffs in this action, respectively the "California Group" or "Litigating States" and "New York Group" or "Settling States."

[3] A number of states who were Plaintiffs in this action have not moved to extend the Final Judgments. According to the New York Movants, "Plaintiff States Illinois, Kentucky, and Ohio do not object to extending the Final Judgments. Plaintiff States Michigan, North Carolina, and

the same liability finding affirmed by the United States Court of Appeals for the District of

Columbia Circuit, and are virtually identical in their substantive provisions.  Nevertheless, the

two Final Judgments were reached via different paths: the New York Movants' Final Judgment

was the result of a negotiated consent decree settling the remedy portion of this case as to certain

state plaintiffs, while the California Movants' Final Judgment was entered by the Court

following a thirty-two day remedy-specific evidentiary hearing.

The Moving States' motions seek the same objective: the extension of the relevant Final

Judgment until November 12, 2012.  The Court has conducted a searching and dedicated review

of the Moving States' motions, Microsoft's Opposition, the Moving States' Reply, and the

exhibits attached to those memoranda.  In addition, the Court has requested further targeted

briefing from the Moving States and Microsoft, and has reviewed each party's filings carefully.

The Court has also given due consideration to the *amicus curiae* brief filed by the United States

of America, Plaintiff in the related action, *United States v. Microsoft Corporation*, Civil Action

No. 98-1232.[4]  Upon a thorough review of all of the foregoing, the relevant statutes and case law,

and the entire record herein, the Court shall GRANT-IN-PART and DENY-IN-PART the

Moving States' motions to extend the Final Judgments.

---

Utah take no position on the decree extension.  Plaintiff State Wisconsin does not join in the
motion."  NY Mem. at 1 n.2.

[4] By separate Order, the Court shall grant the Motion of the United States for Leave to
Participate as Amicus Curiae.  The Court shall also grant the Motion of Visa, Inc. and
Weyerhaeuser Company for Leave to File Brief as Amici Curiae.  The Court has reviewed the
Visa/Weyerhaeuser *amicus* brief and notes that it raises an argument also asserted by Microsoft
and the United States, which is thoroughly considered below.

### *Overview of Court Findings*

The Court's decision in this matter is based upon the extreme and unforeseen delay in the availability of complete, accurate, and useable technical documentation relating to the Communications Protocols that Microsoft is required to make available to licensees under Section III.E of the Final Judgments.  The Court concludes that the Moving States have met their burden of establishing that this delay constitutes changed circumstances, which have prevented the Final Judgments from achieving their principal objectives.  As such, the Court shall extend until November 12, 2009 those provisions of the Final Judgments that have not yet been extended until that date (collectively the "Expiring Provisions"),[5] thus making all provisions of the Final Judgments coterminous.  The Court declines the Moving States' invitation to extend the entirety of the Final Judgments through 2012 at this point in time, concluding that it is premature to do so.

The Court's extension should not be viewed as a sanction against Microsoft; to the contrary, the Court commends Microsoft for its willingness to cooperate with the Plaintiffs in this action and in *United States v. Microsoft* in negotiating solutions to issues as they have arisen throughout the past five years.  Indeed, because the parties have negotiated solutions to each of the myriad issues that have arisen regarding the technical documentation, the Court has never been asked to find Microsoft out of compliance with the Final Judgments, and has not deemed a *sua sponte* finding of non-compliance necessary or fruitful in achieving compliance.  Nevertheless, the fact remains that more than five years after the Final Judgments were entered,

---

[5] The Court's extension of the Expiring Provisions does not include § III.B, which neither the California Movants nor the New York Movants seek to extend.  *See* CA Mem. at 1; NY Mem. at 8 n.14.

the technical documentation required by Section III.E is still not available to licensees in a certifiably complete, accurate, and useable form.  Further, as a result of the delay, the various provisions of the Final Judgments have not yet been given the opportunity to operate together as the comprehensive remedy the Court and the parties envisioned when the Final Judgments were entered.  The Court's extension should thus be viewed as a means to allow the comprehensive remedial scheme embodied in the Final Judgments the chance to maximize Section III.E's procompetitive potential.

The Court cannot know what impact the technical documentation required by Section III.E will have on the market once it is finally available in a complete, accurate, and useable form.  The Moving States, however, proffer realistic examples of ways in which the Expiring Provisions of the Final Judgments can yet play a significant role in helping Section III.E achieve its full potential.  In the face of these examples, the Court concludes that allowing the Expiring Provisions of the Final Judgments to lapse before Section III.E has even been given a chance to succeed might threaten the ability of the Final Judgments to achieve their full procompetitive impact.  The Court therefore concludes that the limited extension it is approving is consonant with the policies of encouraging consent decrees, as well as the Court's authority to modify court-ordered judgments.

## I: BACKGROUND

*A.     Proceedings Leading to the Remedial Final Judgments*

On May 18, 1998, simultaneous with the filing of the complaint in *United States v. Microsoft*, a group of state plaintiffs filed a civil complaint alleging antitrust violations by Microsoft and seeking preliminary and permanent injunctions barring the company's allegedly

unlawful conduct.  *New York v. Microsoft Corporation*, 224 F. Supp. 2d 76, 86 (D.D.C. 2002)

(hereinafter "*Remedy Opinion*").[6]  The instant action asserted claims pursuant to federal and state

law, and was consolidated with the United States' action, which asserted only federal law claims.

*Id.*  Following a bench trial in the consolidated cases, Judge Thomas Penfield Jackson found

Microsoft liable for violating §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and ordered the

division of Microsoft into two separate corporations to remedy those findings of liability.  *Id.*

(citing *United States v. Microsoft Corp.*, 87 F. Supp. 2d 30, 35 (D.D.C. 2000) and *United States*

*v. Microsoft Corp.*, 97 F. Supp. 2d 59, 64 (D.D.C. 2000)).

On Microsoft's appeal of those rulings, the D.C. Circuit deferred to Judge Jackson's

factual findings, affirmed-in-part and reversed-in-part his findings of liability, and vacated the

remedy decree.  *Id.* (citing *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001)

(hereinafter "*Microsoft*")).  Specifically, the D.C. Circuit affirmed only limited violations based

on § 2 of the Sherman Act for illegal monopoly maintenance, and reversed all other grounds for

liability.  Soon thereafter, the consolidated cases were randomly reassigned to this Court, with

instructions to hold a "'remedies-specific evidentiary hearing,' and to 'fashion an appropriate

remedy' in light of the revised liability findings."  *Id.* at 87 (citing *Microsoft*, 253 F.3d at 103,

105).  As the remedies crafted on remand were thus cabined by the D.C. Circuit's findings and

---

[6] The "Plaintiffs" for purposes of the Court's *Remedy Opinion* included the States of
California, Connecticut, Florida, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maryland,
Michigan, Minnesota, New York, North Carolina, Ohio, Utah, West Virginia, and Wisconsin, the
Commonwealth of Massachusetts, and the District of Columbia.  *See* 224 F. Supp. 2d at 86 n.3.
As discussed below, a number of states (the "Settling States" or the "New York Group") litigated
their claims through liability and settled as to the issue of remedy, while other states and the
District of Columbia (the "Litigating States" or the "California Group") participated in the
remedy-specific evidentiary hearing.  *Id.* at n.3, n.4.

instructions in its liability opinion, the Court briefly discusses the key portions of that opinion.

*1.    Appellate Findings and Instructions*

The D.C. Circuit's opinion began by affirming the district court's definition of the

relevant market as "the licensing of all Intel-compatible PC operating systems worldwide."[7]

*Microsoft*, 253 F.3d at 52.  The D.C. Circuit also adopted the district court's determination that

"circumstantial evidence proves that Microsoft possesses monopoly power," and noted that

Microsoft's behavior "may well be sufficient to show the existence of monopoly power," if direct

proof were required.  *Id.* at 56-57.  The D.C. Circuit's adoption of the market definition was

premised on its simultaneous acceptance of Plaintiffs' theory of Microsoft's market dominance.

The district court and appellate court both noted that Microsoft's lawfully-acquired monopoly

was naturally protected by a "structural barrier" known as the "applications barrier to entry."  *Id.*

at 55.  The applications barrier to entry arises because: "(1) most consumers prefer operating

---

[7] "PC" is short for "personal computer."  *Remedy Opinion*, 224 F. Supp. 2d at 89 n.10 (citing *United States v. Microsoft*, 84 F. Supp. 2d 9, ¶ 1 (D.D.C. 1999) (hereinafter "*Findings of Fact*")).  The D.C. Circuit explained the functions of a PC operating system ("OS"):
> Operating systems perform many functions, including allocating computer memory and controlling peripherals such as printers and keyboards.  Operating systems also function as platforms for software applications.  They do this by "exposing"–i.e., making available to software developers–routines or protocols that perform certain widely-used functions.  These are known as Application Programming Interfaces, or "APIs."

*Microsoft*, 253 F.3d at 53 (citations omitted).  Software developers wanting to include a function enabled by a particular API in their applications need not duplicate it in their own code, but rather can "call" or use the API included in Microsoft's "Windows" operating system.  *Id.*  "Microsoft began shipping a software package for the PC called Windows" in 1985, and introduced updated versions in 1995 and 1998, known as Windows 95 and Windows 98, respectively.  *Remedy Opinion*, 224 F. Supp. 2d at 90 n.12 (citing *Findings of Fact* ¶ 7-8).  At the time of this Court's remedy proceeding, the most current version of Windows was Windows XP.  *Id.*  Microsoft has since released another update, known as Windows Vista, which was made available to the general public in January 2007.

systems for which a large number of applications have already been written; and (2) most developers prefer to write for operating systems that already have a substantial consumer base." *Id.* The applications barrier to entry creates a network effects situation, which perpetuates Microsoft's operating system dominance. *Remedy Opinion*, 224 F. Supp. 2d at 89-90. This is because "[e]very operating system has different APIs," such that "applications written for one operating system will not function on another unless the developer undertakes the 'time consuming and expensive' process" of "porting" the application to an alternative operating system. *Id.* (quoting *Microsoft*, 253 F.3d at 53, 55).

During the liability phase of this case, Plaintiffs proceeded on the theory that certain kinds of software products, known as "middleware," could weaken the applications barrier to entry "by serving as platforms for applications, taking over some of the platform functions provided by Windows." *Id.* at 90. Middleware has the ability to expose its own APIs, and Plaintiffs posited that "[u]ltimately, by writing to the middleware API set, applications developers could write applications which would run on any operating system on which the middleware was preset." *Id.*[8] In accepting the district court's definition of the relevant market and Plaintiffs' theory of Microsoft's market dominance, the D.C. Circuit concluded that the district court had properly excluded middleware products from the relevant market. *Id.*

The majority of the D.C. Circuit's opinion focused on Microsoft's challenges to the

---

[8] Plaintiffs focused their attention on "two such middleware threats to Microsoft's operating system dominance–Netscape Navigator and the Java technologies." *Remedy Opinion*, 224 F. Supp. 2d at 90 (citing *Microsoft*, 253 F.3d at 53).

district court's findings of liability under § 2 of the Sherman Act.[9]  The D.C. Circuit addressed

each in turn, and ultimately sustained the district court's findings of liability with respect to the

following specific conduct: (1) the license restrictions Microsoft imposed upon manufacturers of

PCs, known as OEMs, *Microsoft*, 253 F.3d at 59-64; (2) Microsoft's agreements with IAPs, by

which Microsoft agreed "to provide easy access to IAPs' services from the Windows desktop in

return for the IAPs' agreement to promote [Microsoft's Internet Explorer ("IE") web browser]

exclusively and to keep shipments of internet access software using [the competing Navigator]

browser under a specific percentage," *id.* at 67-71; (3) Microsoft's agreements with ISVs, which

required ISVs "to distribute, promote, and rely on IE rather than Navigator," *id.* at 71-72; (4)

Microsoft's exclusive agreement with Apple Computer, "both an OEM and a software

developer," which required Apple to privilege IE over Navigator, *id.* at 71-74; (5) Microsoft's

conduct with respect to the "Java" technologies,[10] including its agreements requiring major ISVs

to promote Microsoft's Java Virtual Machine exclusively, and its deception of Java developers

about the Windows-specific nature of the tools it distributed to them, *id.* at 74-77; and (6)

Microsoft's "threat" to Intel regarding its efforts to develop a "high performance, Windows-

---

[9] For the sake of clarity, the Court defines a number of acronyms that are used throughout the previous opinions of this Court and the D.C. Circuit, as well as in the Final Judgments: "OEMs" are "original equipment manufacturers;" "IAPs" are Internet access providers; "ISVs" are independent software vendors; "IHVs" are independent hardware vendors; and "ICPs" are internet content providers.  *See* Final Judgments, §§ VI.F-I; VI.O.

[10] The "Java" technologies are "a set of technologies developed by Sun Microsystems," which the D.C. Circuit described as "another type of middleware posing a potential threat to Windows' platforms." *Microsoft*, 253 F.3d at 74.

compatible" and "Sun compliant" Java Virtual Machine, *id.* at 77-78.[11]

The D.C. Circuit also imposed liability upon Microsoft for the "state law counterparts of" Plaintiffs' claims pursuant to § 2 of the Sherman Act. *Id.* at 46. Beyond these findings, however, the D.C. Circuit did not find Microsoft liable for any additional antitrust violations. In particular, the D.C. Circuit reversed the district court's conclusion that Microsoft's "course of conduct" as a whole constituted a separate violation of § 2 of the Sherman Act. *Id.* at 78. The D.C. Circuit also rejected the district court's finding of attempted monopolization and remanded Plaintiffs' § 1 tying claim for further proceedings at the district court level. *Remedy Opinion*, 224 F. Supp. 2d at 95.[12] Plaintiffs opted not to pursue their tying claim on remand. *Id.*

After reviewing the district court's conclusions with respect to liability, the D.C. Circuit turned to considering the district court's choice of remedy, which mandated the divestiture of Microsoft Corporation into two separate entities and included a number of "interim restrictions on Microsoft's conduct." *Id.* at 95-96 (quoting *Microsoft*, 253 F.3d at 100). The D.C. Circuit "found three fundamental flaws in the district court's order of remedy, each of which alone justified vacating the remedial decree." *Id.* at 96. First, the D.C. Circuit focused on the district court's failure to hold an evidentiary hearing in the face of disputed facts concerning the remedy.

---

[11] "Intel is a firm engaged principally in the design and manufacture of microprocessors," and a "segment of Intel's business develops software." *Remedy Opinion*, 224 F. Supp. 2d at 95 (quoting *Findings of Fact* ¶ 95).

[12] In addition to the claims described above, Plaintiffs' complaint originally included a separate claim for "monopoly leveraging" under § 2 of the Sherman Act, on which Judge Jackson granted summary judgment in favor of Microsoft because the claim ran "contrary to both economic theory and the Sherman Act's plain language." *Remedy Opinion*, 224 F. Supp. 2d at 95 n.21 (quoting *United States v. Microsoft*, Civil Action No. 98-1233, 1998 WL 614485, at *27 (D.D.C. Sept. 14, 1998)).

*Microsoft*, 253 F.3d at 101-03.  Next, the D.C. Circuit concluded that the district court "failed to provide an adequate explanation for the relief it ordered," by not "explain[ing] how its remedies decree would accomplish [the] objectives" of a remedial decree in an antitrust case.  *Id.* at 103. The D.C. Circuit reiterated that "a remedies decree in an antitrust case must seek to 'unfetter a market from anticompetitive conduct,' to 'terminate the illegal monopoly,[13] deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future.'"  *Id.* (quoting *Ford Motor Co. v. United States*, 405 U.S. 562, 577 (1972) and *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968) (hereinafter "*United Shoe*")).  Finally, the D.C. Circuit concluded that its substantial modifications to the liability imposed by the district court merited a new determination of the remedy for the surviving antitrust violations.  *Id.* at 103-05.

The D.C. Circuit therefore remanded the case to this Court, with instructions to resolve any factual disputes surrounding a remedy and exercise the Court's "broad discretion" in imposing the "relief it calculates will best remedy the conduct . . . found to be unlawful."  *Id.* at 105.  In so doing, the D.C. Circuit "offered specific guidance to this Court regarding the inquiry to be undertaken following remand."  *Remedy Opinion*, 224 F. Supp. 2d at 97.  Of particular

---

[13] As noted in this Court's various remedy-related opinions, "the objective of 'terminating the illegal monopoly,' is incompatible with the facts of this case [because] [n]either the district court, nor the appellate court concluded that Microsoft had illegally obtained its monopoly," but only found that Microsoft had illegally maintained its monopoly. *New York v. Microsoft Corp.*, 231 F. Supp. 2d 203, 211 n.4 (2002) (hereinafter "*Settling States Opinion*") (internal citations omitted).  As a result, the Court's remedy focused on terminating Microsoft's illegal maintenance of its monopoly, rather than on terminating the monopoly itself.  *Id.*; *see also Remedy Opinion*, 224 F. Supp. 2d at 101 (stating that "the proper objective of the remedy in this case is termination of the exclusionary acts and practices related thereto which served to illegally maintain [Microsoft's] monopoly.").

significance, the D.C. Circuit instructed this Court to consider the quantum of proof presented by

Plaintiffs as to the "causal connection between Microsoft's anticompetitive conduct and its

dominant position in the OS market" in determining what remedy to impose. *Microsoft*, 253

F.3d at 106. The D.C. Circuit specifically noted that it had "found a causal connection between

Microsoft's exclusionary conduct and its continuing position in the operating systems market

only through inference," and that the district court "expressly did not adopt the position that

Microsoft would have lost its position in the OS market but for its anticompetitive behavior." *Id.*

at 106-07. The D.C. Circuit also stressed that it had "drastically altered the scope of Microsoft's

liability," and advised this Court to "consider which of the [original] decree's conduct

restrictions remain viable in light of [the] modification of the original liability decision," *id.* at

105. While the D.C. Circuit did not "undertake to dictate to [this] Court the precise form that

relief should take on remand," it noted that the relief "should be tailored to fit the wrong creating

the occasion for the remedy." *Id.* at 107.

2.      *Remedy Proceedings Before This Court*

"Following remand, pursuant to Court Order, the parties in the two consolidated cases

entered into intensive settlement negotiations." *Remedy Opinion*, 224 F. Supp. 2d at 87. These

negotiations resulted in the United States and Microsoft reaching a resolution in *United States v.*

*Microsoft*, in the form of a proposed consent decree. *Id.* In the instant case, the settlement

negotiations were partially successful; the New York Group joined the settlement between the

United States and Microsoft, electing not to proceed to a remedies-specific hearing. *Id.*[14] The

---

[14] The Settling States, or New York Group, include the States of New York, Ohio,
Illinois, Kentucky, Louisiana, Maryland, Michigan, North Carolina, and Wisconsin. *Remedy*
*Opinion*, 224 F. Supp. 2d at 87 n.5.

States that opted not to join the settlement–those in the California Group–proposed a remedy

distinct from that presented in the proposed consent decree.  *Id.*[15]  Following expedited

discovery, an evidentiary hearing on the issue of the remedy commenced on March 18, 2002.  *Id.*

The parties submitted direct testimony in written format, and cross-examination and re-direct

testimony were offered in open court.  *Id.*  "Over thirty-two trial days, the Court reviewed the

written direct testimony and heard the live testimony of fifteen witnesses proffered by Plaintiffs

and nineteen witnesses proffered by Microsoft."  *Id.*

On November 1, 2002, the Court issued three Memorandum Opinions and related

Orders.[16]  The first Memorandum Opinion and accompanying Order, issued in *United States v.*

*Microsoft*, involved the Court's determination, pursuant to the Antitrust Procedures and Penalties

Act ("Tunney Act"), 15 U.S.C. § 16(b)-(h), that, with the exception of the provisions relating to

the Court's retention of jurisdiction–which the Court revised to be both more specific and more

broadly drawn[17]–the consent decree proposed by the United States and Microsoft was in the

---

[15] The Litigating States, or California Group, include the States of California, Connecticut, Florida, Iowa, Kansas, Minnesota, Utah, and West Virginia, the Commonwealth of Massachusetts, and the District of Columbia.  *Remedy Opinion*, 224 F. Supp. 2d at 86 n.3.

[16] The Court entered three Final Judgments in November 2002; two in the instant case, and one in *United States v. Microsoft*.  Because the United States does not seek to extend the Final Judgment in *United States v. Microsoft*, however, this opinion addresses only the two "Final Judgments" entered in this case.

[17] As discussed in greater detail below, the Court deemed it "imperative, in this unusually complex case, for the Court's retention of jurisdiction to be clearly articulated and broadly drawn," and therefore suggested that the parties amend the proposed consent decree to reserve for the Court "the power to *sua sponte* issue orders or directions regarding [] the final judgment, including, but not limited to orders regarding the construction or carrying out of the final judgment, the enforcement of compliance therewith, and the punishment of any violation thereof."  *Tunney Act Opinion*, 231 F. Supp. 2d at 201.  The Court concluded such a provision would "ensure that the Court retain[] the power intended by the parties and which the Court

public interest.  *See generally United States v. Microsoft Corp.*, 231 F. Supp. 2d 144 (D.D.C.

2002) (hereinafter "*Tunney Act Opinion*").[18]  The second Memorandum Opinion and Order,

issued in the instant case, similarly concluded that, with the exception of the retention of

jurisdiction provision, the consent decree proposed by the Settling States and Microsoft resolved

the controversy in a manner consistent with the public interest.  *See generally New York v.

Microsoft Corp.*, 231 F. Supp. 2d 203 (D.D.C. 2002) (hereinafter "*Settling States Opinion*").  The

*Settling States Opinion* incorporated by reference the Court's *Tunney Act Opinion*.  The final

Memorandum Opinion and accompanying Final Judgment addressed the dueling remedy

proposals presented to this Court by Microsoft and the California Group, which formed the basis

for the remedy-specific evidentiary hearing.  *See generally Remedy Opinion*, 224 F. Supp. 2d 76.

The Final Judgments approved as to the Settling States and the Litigating States are

substantively quite similar.  This similarity is not surprising because both the Settling States'

consent decree and the Court-ordered remedy followed upon, and were constrained by, the D.C.

Circuit's specific liability findings, as well as its guidance as to the nature of an appropriate

remedy in light of those findings.  Each Final Judgment, in keeping with the goals of antitrust

remedies described by the D.C. Circuit in its liability opinion and relevant Supreme Court

precedent, addresses not only those specific acts for which the D.C. Circuit imposed liability, but

also includes forward-looking remedies designed to "effectively pry open to competition a

market that has been closed by defendants' illegal restraints."  *Remedy Opinion*, 224 F. Supp. 2d

---

deem[ed] necessary to ensure effective implementation of the final judgment in this case."  *Id.*

[18] In a previous Memorandum Opinion, the Court had reviewed the pertinent procedural
history and determined that the parties had satisfied the other requirements of the Tunney Act.
*See generally United States v. Microsoft Corp.*, 215 F. Supp. 2d 1 (D.D.C. 2002).

at 100, 108 (quoting *International Salt Co. v. United States*, 332 U.S. 392, 401 (1947)).

Significantly, in the *Settling States Opinion*, the Court noted that the Settling States' proposed

consent decree "takes account of the theory of liability advanced by Plaintiffs, the actual liability

imposed by the appellate court, the concerns of the Plaintiffs with regard to future technologies,

and the relevant policy considerations." *Settling States Opinion*, 231 F. Supp. 2d at 259

(incorporating *Tunney Act Opinion*).   These are the same factors that the Court weighed in the

remedy proceeding.  *See generally Remedy Opinion*, 224 F. Supp. 2d 76.

  *B.*  *The Final Judgments*

  The following description highlights the key provisions that are common to both Final

Judgments, and notes the few instances in which the Final Judgments differ.  At the outset, the

Court notes the following definitions, which are important to understanding the parameters of the

Final Judgments:

-  The term "Non-Microsoft Middleware" incorporates the middleware threats that were the focus of the liability phase, and includes "a non-Microsoft software product running on a Windows Operating System Product that exposes a range of functionality to ISVs through published APIs, and that could, if ported to or made interoperable with, a non-Microsoft Operating System, thereby make it easier for applications that rely in whole or in part on the functionality supplied by that software product to be ported to or run on that non-Microsoft Operating System." Final Judgments, § VI.M.

-  A "Non-Microsoft Middleware Product" is similar to "Non-Microsoft Middleware," but adds the requirement that "at least one million copies" of the product "were distributed in the United States within the previous year." *Id.*, § VI.N.

-  The term "Microsoft Middleware Product" is defined according to a specific set of Microsoft functionalities existing at the time of the Final Judgments, as well as future Microsoft functionality.  The existing set of functionalities are those provided by "Internet Explorer, Microsoft's Java Virtual Machine, Windows Media Player, Windows Messenger, Outlook Express and their successors in a

14

Windows Operating System Product." The future technologies include software included in Windows that provides the functionality of internet browsers, email client software, networked audio/video client software, or instant messaging software. Also included in the definition of "Microsoft Middleware Product" are future functionalities that are both distributed as part of Windows and separately from Windows by Microsoft, trademarked by Microsoft, and which compete with Non-Microsoft Middleware Products. *Id.*, § VI.K.

• The term "Microsoft Middleware" is similar to "Microsoft Middleware Product," but is limited to the software code that is separately distributed and trademarked or marketed as a major version of a Microsoft Middleware Product. *Id.*, § VI.J.

      *1.    Substantive Provisions Contained in Section III*

The substantive proscriptions of each Final Judgment are included within Section III, which is entitled "Prohibited Conduct." Subsections A through C of § III focus on Microsoft's dealing with OEMs. Section III.A bars Microsoft from retaliating against OEMs for (i) "developing, distributing, promoting, using, selling, or licensing" software or Non-Microsoft Middleware, (ii) shipping a Personal Computer that includes a non-Microsoft Operating System, or (iii) exercising options or alternatives provided by the Final Judgment. *Id.* at § III.A.[19] Section III.A also requires Microsoft to provide Covered OEMs with written notice before terminating their licenses for Windows Operating Systems Products. *Id.*[20] In the *Remedy Opinion*, the Court described § III.A as "provid[ing] substantial freedom to OEMs in their configuration of Microsoft's Windows operating system by lifting Microsoft's illegal license restrictions." 224 F. Supp. 2d at 152. Under § III.B, Microsoft is required to provide Windows

_____

[19] Section III.A of the Litigating States' Final Judgment also prohibits Microsoft from threatening retaliation against OEMs for the same conduct. Litigating States Final Judgment, § III.A.

[20] "Covered OEMs" are "the 20 OEMs with the highest worldwide volume of licenses of Windows Operating System Products reported to Microsoft in Microsoft's fiscal year preceding the effective date of the Final Judgment[s]." Final Judgments, § VI.D.

Operating System Products to Covered OEMs "pursuant to uniform license agreements with uniform terms and conditions."  Final Judgments, § III.B.  To this end, § III.B requires the royalties Microsoft charges to be set forth in a uniform schedule published on a website accessible to the Plaintiffs and the Covered OEMs.  *Id.*[21]

Section III.C "secure[s] for OEMs the general ability to install and display icons, shortcuts and menu entries for middleware . . . on the Windows desktop or in the Start menu," while reflecting "the care with which the appellate court separated anticompetitive restrictions from legitimate license restrictions."  *Remedy Opinion*, 224 F. Supp. 2d at 153.  As such, § III.C generally prohibits Microsoft from restricting by agreement any OEM licensee from: (1) installing and displaying icons, shortcuts, or menu entries for any Non-Microsoft Middleware or any product or service that distributes, uses, promotes or supports any Non-Microsoft Middleware, where such applications are generally displayed; (2) distributing or promoting Non-Microsoft Middleware by installing and displaying on the desktop shortcuts of any size or shape so long as they do not interfere with the functionality of the user interface; (3) launching automatically any Non-Microsoft Middleware;[22] (4) offering users the option of launching other

---

[21] As noted above, the Moving States do not seek to extend § III.B.

[22] The Settling States' Final Judgment provides that Microsoft may not impede an OEM's ability to automatically launch Non-Microsoft Middleware "if a Microsoft Middleware Product that provides similar functionality would otherwise be launched automatically."  Settling States Final Judgment, § III.C.3.  In contrast, the Litigating States' Final Judgment narrows further the situations in which Microsoft may impede an OEM's ability to automatically launch Non-Microsoft Middleware, limiting Microsoft's ability to do so to those circumstances where the Non-Microsoft Middleware "replaces or drastically alters the Windows Operating System Product user interface."  Litigating States Final Judgment, § III.C.3.

16

Operating Systems; (5) presenting in the initial boot sequence its own IAP offer;[23] or (6) exercising any of the options provided in § III.H of the Final Judgments.  Final Judgments, § III.C.

The Court's *Remedy Opinion* described Sections III.D and III.E of the Final Judgments as "explicitly forward-looking remedies," which "reflect an agreement that effective interoperation between software running on two or more devices will play an integral role in the successful emergence of new software products and platforms."  *Remedy Opinion*, 224 F. Supp. 2d at 171. Elsewhere in the *Remedy Opinion*, the Court acknowledged that the "interoperability disclosures" contained in §§ III.D and III.E were not "directly related to the imposition of liability," but rather "aimed at the broader goals of unfettering the market and restoring competition."  *Id.* at 226; *see also Settling States Opinion*, 231 F. Supp. 2d at 244-45 (incorporating the *Tunney Act Opinion*, and stating that "while the rationale for this type of disclosure rests, in part, upon the finding of liability for conditioning the provision of technical information on illegal, exclusive agreements, it can be viewed more broadly to relate to the United States' theory of the case as a whole.").

Section III.D requires Microsoft to disclose to ISVs, IHVs, IAPs, ICPs, and OEMs the APIs and related documentation that are used by Microsoft Middleware to interoperate with a Windows Operating System Product.  Final Judgments, § III.D.  Section III.E requires Microsoft–starting nine months after the submission of the Settling States' Final Judgment to the Court and three months after the entry of the Litigating States' Final Judgment–to make available

---

[23] The Settling States' Final Judgment prevents Microsoft from impeding by agreement an OEM's ability to present its own IAP offer during the initial boot sequence, "provided that the OEM complies with reasonable technical specifications established by Microsoft."  Settling States Final Judgment, § III.C.5.  In contrast, the Litigating States' Final Judgment contains no such requirement or restriction, Litigating States Final Judgment, § III.C.5.

for use by third parties "on reasonable and non-discriminatory terms (consistent with Section III.I) any Communications Protocol that is, on or after the date [the] Final Judgment is submitted to the Court, (i) implemented in a Windows Operating System Product installed on a client computer, and (ii) used to interoperate, or communicate, natively . . . with a Microsoft server operating system product."  Final Judgments, § III.E.  Section III.E describes "native" communications as "without the addition of software code to the client operating system product."  *Id.*

The Court's *Remedy Opinion* described § III.E as "[i]n all likelihood" "the *most* forward-looking provision in the Court's remedy."  *Remedy Opinion*, 224 F. Supp. 2d at 173.  Section III.E was included in the Settling States' consent decree based on the United States' belief that the Final Judgment's "effectiveness would be undercut unless it addressed the rapidly growing server segment of the market."  *Settling States Opinion*, 231 F. Supp. 2d at 249 (incorporating the *Tunney Act Opinion*).  Section III.E represented an effort to "obtain protection which is prospective in its focus" despite "the rapid pace of change in the software industry," so that the "core of the decree would [not] prove prematurely obsolete."  *Id.*  Similarly, § III.E was included in the Court-imposed Litigating States' remedy based on the Court's conclusions that:

> server operating systems can perform a function akin to that performed by traditional middleware because they provide a platform for applications running 'for' use on a PC.  The mandatory disclosure of the communications protocols relied upon by Microsoft's PC operating system to interoperate with its server operating systems will advance the ability of non-Microsoft operating systems to interoperate, or communicate, with the ubiquitous Windows PC client. Advancement of the communication between non-Microsoft server operating systems and Windows clients will further the ability of these non-Microsoft server operating systems to provide a platform which competes with Windows itself.

*Remedy Opinion*, 224 F. Supp. 2d at 172-73.

Sections III.F, III.G, and III.H of the Final Judgments relate to "other participants in the ecosystem," namely ISVs, IHVs, IAPs, ICPs, and end users. *See Remedy Opinion*, 224 F. Supp. 2d at 166. Section III.F bars Microsoft from retaliating against ISVs or IHVs for "developing, using, promoting or supporting any [competing software] or any software that runs on any [competing software]." Final Judgments, § III.F.[24] In addition, § III.F prohibits Microsoft from entering into any agreement relating to a Windows Operating System Product that conditions the grant of any consideration on an ISV's refraining from developing, using, distributing or promoting any competing software, unless the condition is related to a bona fide contractual obligation of the ISV regarding Microsoft software. *Id.* Section III.G, in turn, generally precludes Microsoft from entering into any agreement with any IAP, ICP, ISV, IHV or OEM that requires any such entity to distribute, promote, use or support, "exclusively or in a fixed percentage, any Microsoft Platform Software." Final Judgments, § III.G. Section III.G also prohibits Microsoft from entering agreements with IAPs or ICPs that grant placement in any Windows Operating System Product "on condition that the IAP or ICP refrain from distributing, promoting or using any software that competes with Microsoft Middleware." *Id.*

Section III.H requires Microsoft to allow end users and OEMs to enable or remove access to each Microsoft Middleware Product or Non-Microsoft Middleware Product, by designating a Non-Microsoft Middleware Product to be invoked in place of a Microsoft Middleware Product, i.e., as a default, in certain situations. Final Judgments, § III.H. Section III.H also prohibits Microsoft from designing its Windows Operating System Products so as to induce

---

[24] Like § III.A, § III.F of the Litigating States' Final Judgment also prohibits Microsoft from threatening retaliation against ISVs and IHVs. Settling States Final Judgment, § III.F.

reconfiguration of an OEM's or consumer's formatting of icons, shortcuts, and menu items less than 14 days after the initial boot up of a new PC, or without first seeking confirmation from the user. *Id.*

Section III.I is closely related to the disclosures mandated by §§ III.D and III.E, *see Settling States Opinion*, 231 F. Supp. 2d at 249, and obligates Microsoft to "license to ISVs, IHVs, IAPs, ICPs, and OEMs any intellectual property rights owned or licensable by Microsoft that are required to exercise any of the options or alternatives expressly provided to them under [the Final Judgments]" on "reasonable and non-discriminatory terms" that are limited in scope so as to be "no broader than is necessary." Final Judgments, § III.I. Finally, § III.J limits Microsoft's disclosures under the Final Judgments to ensure that the mandated disclosures do not result in the release of information that "would compromise the security of a particular installation . . . of anti-piracy, anti-virus, software licensing, digital rights management, encryption or authentication systems," and limits Microsoft's disclosure obligations with respect to a specific subset of security-related APIs and communications protocols. Final Judgments, § III.J. Section III.J also provides that Microsoft is not required to disclose any API, interface, or other information if Microsoft is "lawfully directed not to do so by a governmental agency of competent jurisdiction." *Id.*

2.     *Compliance, Enforcement, and Termination*

While each Final Judgment provides that the relevant "Plaintiffs shall have exclusive responsibility for enforcing this Final Judgment," Final Judgments, § IV.A, the Final Judgments differ significantly in their compliance and enforcement provisions. The Settling States' Final Judgment provides for the creation of "a three-person Technical Committee ("TC") to assist in

enforcement of and compliance with" that Final Judgment.  Settling States Final Judgment, §

IV.B.1.  The members of the TC are "experts in software design and programming," who meet

requirements demonstrating their independence from Microsoft, and who are selected by a

detailed procedure.  *Id.*, § IV.B.2.  The TC is broadly empowered to "monitor Microsoft's

compliance with its obligations under [the] Final Judgment," and is answerable to the United

States and the Settling States, rather than to the public or to the Court.  *Id.*, § IV.B.8.a., §

IV.B.8.e.  Although the TC serves the United States and the Settling States, "Microsoft is

responsible for the cost and expense of the service of the committee."  *Settling States Opinion*,

231 F. Supp. 2d at 253-54 (incorporating *Tunney Act Opinion*).

The Settling States' Final Judgment also provides for a Microsoft Internal Compliance

Officer, who "is far more closely aligned with Microsoft."  *Id.* at 254.  The Compliance Officer is

a Microsoft employee responsible for administering Microsoft's antitrust compliance program

and "helping to ensure compliance" with the Final Judgment.  Settling States Final Judgment, §

IV.C.  The TC and the Compliance Officer both may receive complaints from the United States,

the Settling States, and third parties, as well as each other, regarding Microsoft's compliance

with the terms of the Final Judgment.  *Id.*, § IV.D.  The Final Judgment includes specific

provisions as to actions the TC and the Compliance Officer are obliged to take in conjunction

with complaints received.  *Id.*

As the Court explained in the *Settling States Opinion*, "ultimately the power to enforce

the terms of the decree rests with the government," i.e., the United States and the Settling States,

and the TC was "not intended as a substitute for the enforcement authority of the United States"

and the Settling States.  *Settling States Opinion*, 231 F. Supp. 2d at 255-56 (incorporating *Tunney*

*Act Opinion*).  Rather, the TC was intended as a "mechanism for the provision of impartial and expert compliance assessment to the parties charged with enforcement."  *Id.* at 256.

Unlike the Settling States, during the remedy hearing before this Court, the Litigating States were "unwaveringly critical of Microsoft's proposal for a technical committee," and the Court therefore declined to impose a technical committee upon the Litigating States in their remedy.  *Remedy Opinion*, 224 F. Supp. 2d at 182.  Instead, the Litigating States' Final Judgment provides for the creation of a Compliance Committee made up of at least three non-employee members of the Microsoft Board of Directors.  Litigating States Final Judgment, § IV.B.1.  The Compliance Committee, in turn, hires a Compliance Officer, who is "responsible for development and supervision of Microsoft's internal programs to ensure compliance with the antitrust law and [the] Final Judgment."  *Id.*, § IV.B.2.

In addition to vesting the respective plaintiff states with enforcement authority and creating mechanisms to support those efforts, the Final Judgments include two paragraphs regarding the Court's retention of jurisdiction.  First, the Final Judgments provide:

> Jurisdiction is retained by this Court over this action such that the Court may act *sua sponte* to issue further orders or directions, including but not limited to orders or directions relating to the construction or carrying out of this Final Judgment, the enforcement of compliance therewith, the modification thereof, and the punishment of any violation thereof.

Final Judgments, § VII.  The Court's *Tunney Act Opinion* and *Settling States Opinion* each specifically conditioned approval of the relevant consent decree on the parties amending their respective consent decrees to include this reservation of jurisdiction.  *Settling States Opinion*, 231 F. Supp. 2d at 258-59; *see also Tunney Act Opinion*, 231 F. Supp. 2d at 201-02.  The Court did so out of concern that, without such a provision, the language of the Final Judgments might

not "clearly vest the Court with the authority to act *sua sponte* to order certifications of compliance and other actions by the parties." *See Settling States Opinion*, 231 F. Supp. 2d at 258; *Tunney Act Opinion*, 231 F. Supp. 2d at 200-01.  The Court deemed it "imperative, in this unusually complex case, for the Court's retention of jurisdiction to be clearly articulated and broadly drawn." *Settling States Opinion*, 231 F. Supp. 2d at 258; *Tunney Act Opinion*, 231 F. Supp. 2d at 200-01.  The Court therefore included the same retention of jurisdiction in the Litigating States' Final Judgment.

In addition to providing for the retention of *sua sponte* jurisdiction, the Final Judgments provide that:

> Jurisdiction is retained by this Court over this action and the parties thereto for the purpose of enabling either of the parties thereto to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify or terminate any of its provisions, to enforce compliance, and to punish violations of its provisions.

Final Judgments, § VII.  It is this provision of the Final Judgments that the Moving States invoke in their motions.

As to the term of the Final Judgments, each provides "[u]nless [the] Court grants an extension, this Final Judgment will expire on the fifth anniversary of the date it is entered by the Court."  Final Judgments, § VI.A.  In discussing the appropriate term for the Final Judgment in the remedy proceeding, the Court noted that there was "little dispute that many of the acts which gave rise to the imposition of liability in [the] case ha[d] long since ceased."  224 F. Supp. 2d at 184.  The Court further observed that there was "no dispute that the industry at issue in [the] case is remarkable for its constant and rapid change," and noted the D.C. Circuit's concern in its liability opinion as to the difficulties inherent in crafting conduct remedies in quickly shifting

23

markets. *Id.* (quoting *Microsoft*, 253 F.3d at 49).  In that vein, the Court acknowledged that "it is beyond the capacity of this Court, counsel, or any witness, to craft a remedy in 2002, for antitrust violations which commenced in the mid-1990s, which will be appropriately tailored to the needs of a rapidly changing industry in 2012." *Id.*  Cognizant of the fact that an "antitrust decree should endure only so long as is necessary to ensure competition," the Court concluded that a five-year term was appropriate.  *Id.*  For similar reasons, the Court's *Tunney Act Opinion*, and thus the *Settling States Opinion*, concluded that the consent decree's five-year term was in the public interest, notwithstanding the fact that prior cases (not involving this technology) brought by the Antitrust Division of the United States Department of Justice had resulted in ten-year decrees.  *Settling States Opinion*, 231 F. Supp. 2d at 252 (incorporating *Tunney Act Opinion*).

Finally, each Final Judgment describes one specific scenario in which the Final Judgments might be extended by the Court, allowing the Plaintiffs to "apply to the Court for a one-time extension of this Final Judgment of up to two years . . . [i]n any enforcement proceeding in which the Court has found that Microsoft has engaged in a pattern of willful and systematic violations." *Id.*, § VI.B.  The Final Judgments do not, however, indicate that § VI.B represents the sole scenario in which the Final Judgments might be extended, and the Moving States do not purport to invoke that provision in their motions.

The Commonwealth of Massachusetts alone appealed the Litigating States' Final Judgment, challenging many of the substantive provisions described above.  The D.C. Circuit's opinion on appeal addressed each challenged provision and "affirm[ed] [this Court's] remedial decree in its entirety," finding that the Court's "reasoning was based upon evidence in the record, was sound, and involved no abuse of discretion."  *Massachusetts v. Microsoft Corp.*, 373 F.3d

24

1199, 1204, 1234 (D.C. Cir. 2004) (hereinafter "*Massachusetts v. Microsoft*").  In the same

opinion, the D.C. Circuit addressed arguments raised by third-parties who sought to intervene in

the Court's public-interest determination under the Tunney Act, and upheld this Court's

"approval of the consent decree as being in the public interest."  *Id.* at 1204.  In affirming this

Court's opinions, the D.C. Circuit reiterated that, "key to the proper remedy in this case is to end

Microsoft's restrictions on potentially threatening middleware, prevent it from hampering similar

nascent threats in the future, and restore the competitive conditions created by similar

middleware threats."  *Massachusetts v. Microsoft Corp.*, 373 F.3d at 1243.

      C.    *Implementation of the Final Judgments*

     The Court entered the Litigating States' Final Judgment on November 1, 2002, and

entered the Settling States' Final Judgment Pursuant to Rule 54(b) on November 12, 2002.  On

May 14, 2003, the Court issued an Order requiring the parties to file joint status reports with the

Court every six months regarding Microsoft's compliance with the Final Judgments and

Plaintiffs' enforcement efforts.  That Order provided that status conferences would be scheduled

within one month of the Court's receipt of each status report.  Over time, however, in response to

various issues, the Court's practice evolved to include a Joint Status Report (hereinafter "JSR")–

filed jointly by the United States, the New York Group, the California Group, and Microsoft, in

both this action and *United States v. Microsoft*–and a corresponding status conference

approximately every three months.  In addition, for reasons described below, in January 2006

Microsoft began filing monthly Supplemental Status Reports regarding its compliance efforts in

connection with § III.E of the Final Judgments.

     The Court has kept abreast of the Plaintiffs' enforcement efforts and Microsoft's

compliance efforts through the myriad Status Reports filed and status conferences held over the past five years.  In order to place the Moving States' motions in context, the Court briefly summarizes the major developments over the past five years.  The Court first addresses those related to provisions of the Final Judgments other than § III.E, before turning to those connected with § III.E.  As detailed below, Section III.E has, over time, become the focus of the parties' and the Court's attention, as well as the source of the most ongoing compliance issues.

At the outset, the Court commends the members of the TC as well as the California Group's technical expert, Mr. Craig Hunt, who has worked alongside the TC in many of its compliance efforts related to Section III.E.  In the Court's view, the TC has truly become one of the most successful aspects of the Final Judgments, because it has been invaluable in facilitating the Plaintiffs' enforcement efforts.[25]  As the Court noted when the Final Judgments were entered, the instant case is an "unusually complex" one, *Settling States Opinion*, 231 F. Supp. 2d at 258 (incorporating *Tunney Act Opinion*), and the TC has provided the Plaintiffs with crucial technical expertise by providing advice and evaluating Microsoft's compliance with the Final Judgments. The TC has gone far beyond the simple "monitoring" with which it was tasked in the Settling States' Final Judgment, *see* Settling States' Final Judgment, § IV.B.8.a, to providing testing,

---

[25] As noted above, because the Litigating States opposed the creation of a technical committee, their Final Judgment included only a Compliance Officer.  Over time, however, the Litigating States recognized the beneficial role the TC played in the Settling States' enforcement efforts.  *See* 9/11/07 Status Conference Hrg. Tr. at 38:14-39:7.  In addition, as Section III.E emerged as the main area of compliance-related issues, the Litigating States retained their own expert on communications protocols and technical documentation standards, Mr. Craig Hunt. *See* 7/9/04 Joint Status Report.  Mr. Hunt has since worked alongside the TC, and participated in its activities on behalf of the Litigating States.  Practically speaking, then, the TC's activities have redounded to the benefit of all of the Plaintiffs, not only the Settling States.  Moreover, when the Court refers to the TC henceforth, it intends that term to include Mr. Hunt.

feedback, and critiques that have proved critical to the Plaintiffs' efforts to maximize the full potential of the Final Judgments' remedies.

The TC's expertise has allowed Plaintiffs to reap another, undoubtedly significant benefit from the Final Judgments: beginning in the Summer of 2004, "Plaintiffs, with the assistance of the TC, [began] discussions with Microsoft concerning the successor operating system to Windows XP," which was eventually released as Windows Vista. 7/9/04 JSR at 7. Plaintiffs focused on changes in Vista that might implicate Sections III.C and III.H of the Final Judgments, reviewed materials supplied by Microsoft, discussed their concerns with Microsoft, and were actually able to effect changes to Vista in advance of its release, particularly with respect to the methods for setting default middleware. *See generally id.*; 10/8/04 JSR; 10/19/05 JSR at 8-9. Throughout that process, the TC developed a number of testing tools that middleware ISVs used to ensure "Vista-readiness" prior to the shipment of Windows Vista. 10/19/05 JSR at 9-10; 11/21/06 JSR at 5-6; 3/6/07 JSR at 6-7. In addition to their oversight efforts related to Vista, Plaintiffs were also able to "stud[y] the new search feature in Internet Explorer 7 and discuss[] its implications with Microsoft months before it was included in the beta versions released to consumers." 5/12/06 JSR at 13.

The Court also notes that the enforcement and voluntary dispute resolution mechanisms of the Final Judgments have been a resounding success. Over the past five years, a variety of complaints have been brought to the parties' attention by third parties, and the parties themselves have also identified areas of concern. Through discussions with Microsoft and the TC, the Plaintiffs have determined which issues fall within the scope of the Final Judgments and whether those issues raise concerns as to Microsoft's compliance. Where Plaintiffs have identified a

27

compliance-related concern, they have engaged in constructive negotiations with Microsoft and have–based largely upon the TC's ability to evaluate the technical significance of issues and advise the Plaintiffs and Microsoft as to potential solutions–been able to resolve them through cooperation rather than litigation.  The Court has always encouraged the parties to negotiate solutions and avoid litigation, and continues to do so.  Indeed, the Court commends Microsoft for being open to concerns raised by the TC and third parties, being willing to negotiate workable solutions rather than becoming intransigent, and thus seeking to avoid costly and complex litigation.

Nevertheless, the Court would be remiss in suggesting that the compliance and enforcement road has been altogether smooth, even outside the context of Section III.E's implementation.  It is certainly true that, as Microsoft stresses, it has never been found to be out of compliance with the Expiring Provisions of the Final Judgments.  *See* Memorandum of Points and Authorities of Microsoft Corporation in Opposition to Certain Plaintiff States' Motions to Extend the Final Judgments (hereinafter "MS Opp'n") at 11.  However, it is also true that, over the years, compliance-related issues have arisen regarding virtually every aspect of Section III that the Plaintiffs have determined merited further investigation and warranted concern with Microsoft's compliance efforts.  *See* 7/3/03 JSR at 4-6 (describing ongoing questions related to § III.B compliance); 2/8/06 JSR at 10 (describing complaint under § III.C regarding OEM ability to customize first-boot experience); 6/19/07 JSR at 7-8 (describing reports alleging failure to disclose APIs as required by § III.D); 10/8/04 JSR at 7-8, 11 (describing concern pursuant to § III.F regarding Microsoft contracts for .NET Framework); 10/19/05 JSR (describing issue under § III.G regarding draft specification for promotional CD that included exclusivity requirement);

10/17/03 JSR at 5-6 (describing § III.H issue relating to automatic invocation of IE).  In each instance, the parties have–with the assistance of the TC–been able to negotiate a solution that has been acceptable to the parties and the Court.  These negotiated solutions have obviated the need for compliance-related litigation and have precluded any possible Court findings of non-compliance.

> D.      *The Section III.E Saga*

By far, the most significant focus of attention and criticism by the parties and the Court over the past five years has been Section III.E of the Final Judgments, which the Court once described as "the *most* forward-looking provision in [its] remedy." *Remedy Opinion*, 224 F. Supp. 2d at 173.  Despite its originally forward-looking nature, no one involved–including the United States–disputes that more than five years after the entry of the Final Judgments, Section III.E still has yet to be fully implemented.  The Court briefly recounts the tortured history that has led to this point.

Section III.E of the Final Judgments requires Microsoft to license "on reasonable and non-discriminatory terms (consistent with Section III.I) any Communications Protocol" that is "(i) implemented in a Windows Operating System Product installed on a client computer, and (ii) used to interoperate, or communicate, natively . . . with a Microsoft server operating system product."  Final Judgments, § III.E.  As the California Movants stress, Microsoft was aware that it would be required to produce Communications Protocols and corresponding technical documentation at least as early as November 2001, when it entered into the consent decree with the United States and the Settling States.  CA Mem. at 6.  That consent decree obligated Microsoft to make Communications Protocols available starting nine months after the consent

decree was submitted to the Court, or in August 2002, while the Litigating States' Final Judgment required Microsoft to make Communications Protocols available three months after entry of that Final Judgment, or in February 2003.  Final Judgments, § III.E.

When the Court held its first compliance-related Status Conference in this case on July 24, 2003, Microsoft represented that it had "identified more than 100 Communications Protocols encompassed by Section III.E" and developed a program, known as the Microsoft Communications Protocol Program ("MCPP"), under which third parties could license all of the Communications Protocols or a subset thereof.  7/3/03 JSR at 21.  Microsoft also advised the Court that it had developed more than 5,000 pages of technical documentation, "produced by approximately ten technical writers working full-time for nine months."  *Id.*  Microsoft began offering licenses under the MCPP in August 2002 and, as of July 2003, four ISVs had signed license agreements with Microsoft.  *Id.* at 22.

Plaintiffs' initial § III.E enforcement efforts focused on ensuring that MCPP licenses were offered on reasonable and non-discriminatory terms, as required by §§ III.E and III.I of the Final Judgments.  *See id.* at 6-10.  Plaintiffs continued to investigate issues relating to the terms, royalty rates, and structure of the licenses offered under the MCPP into early 2004.  *See generally* 10/17/03 JSR.  Throughout that period, Plaintiffs–including the United States, the New York Group, and the California Group–stressed that the delay in Section III.E's implementation might undermine its "forward-looking" nature.  *See* 7/3/03 JSR at 9.  In response, in October 2003 Microsoft reported that it had decided to allow licensees to extend the term of their licenses for an additional five years at any point during the license period.  10/17/03 JSR at 8-9.  Still, in January 2004, Plaintiffs jointly advised the Court that, after conducting interviews with most of

the then-current MCPP licensees as well as a number of prospective licensees, they were

"concerned that the current licensing program has thus far fallen short of satisfying fully the

goals of Section III.E."  1/16/04 JSR at 2-3.

Also in January 2004, Plaintiffs reported to the Court that they had received a complaint

regarding the sufficiency and completeness of the technical documentation provided by

Microsoft to MCPP licensees, which the TC was investigating.  *Id.* at 9.  Plaintiffs reported a

second complaint in this vein in April 2004, and informed the Court that the TC had "begun an

investigation into this issue."  4/14/04 JSR at 4-5.  "As a result of this investigation and other

work performed by the Plaintiffs, [Plaintiffs] concluded that the technical documentation

nee[ded] substantial revision in order to ensure that it [would be] usable by licensees across a

broad range of implementations as envisioned by Section III.E."  *Id.* at 5.  Thus began the saga of

the technical documentation, which continues unresolved to this day.

During the rest of 2004, the parties worked towards collectively developing a standard for

completeness to which the technical documentation would be held, with the expectation that the

project would be completed by the fall of 2004.  7/9/04 JSR at 5-6.  All Plaintiffs–the state

plaintiffs as well as the United States–continued to voice their concern that the delayed

implementation of Section III.E should not be allowed to "reduce the useful life of the licensed

technology to current and potential licensees."  4/14/04 JSR at 5.  In response, Microsoft revised

the MCPP license to provide for a two-year extension for the availability of the MCPP (until

November 2009), and committed to allowing licensees to use the licensed protocols to develop

products in perpetuity.  7/9/04 JSR at 4-5.

Microsoft released its first major revision of the technical documentation in early

December 2004.  1/25/05 JSR at 3.  While Plaintiffs believed that it represented a "significant improvement" over the previous documentation, they all remained concerned that further work was needed to ensure its completeness, usability, and accuracy.  *Id.*  To that end, the parties agreed to a comprehensive plan designed to remedy the deficiencies, which they expected to be completed in one year, i.e., by early 2006.  *Id.* at 3-5.  That plan involved two efforts, one to be undertaken by the TC, the other by Microsoft.  *Id.*  The TC's portion of the plan soon began to make extensive progress, 6/1/05 JSR at 2-3, while Microsoft's portion of the plan–dubbed "Troika"–became mired in difficulties, *see generally id.*  By October 2005, the parties reported that under a "best-case" scenario, the Troika project would be completed in October 2006, ten months later than originally projected, and Microsoft admitted "[q]uite frankly," that it "did not fully appreciate the scale, complexity, cost, and duration of the project," and "overestimated the capability of existing technologies to meet the requirements of the effort."  10/19/05 JSR at 5-6, 14.

As the Troika-related problems emerged, the Plaintiffs–particularly those within the California Group–began to question whether Microsoft was devoting the resources necessary to ensure that Section III.E resulted in complete, accurate, and useable technical documentation.  *See* 10/26/05 Status Hrg. Tr. at 20:7-26:19 (expressing the California Group's opinion that "[e]ssentially, Microsoft hasn't done what it promised to do" and stressing the significance of the technical documentation within the Final Judgments' overall remedial scheme).  The Court likewise stressed the significance of accurate and complete technical documentation during various status conferences, admonishing Microsoft that "if there is an issue of resources, then put them in, whatever it takes to make this work."  *Id.* at 33:11-14.

In the Fall of 2005, the parties and the Court focused their attention on the Troika project, and the parties developed another four-part plan to address the project delays.  11/18/05 JSR at 2. The parties' plan called upon the TC to assume responsibility for an increasingly significant portion of the work that Microsoft had previously committed to completing, while Microsoft agreed to "increase the resources dedicated to responding to the TC and to making resulting changes to the technical documentation" in response to Technical Documentation Issues ("TDIs") identified by the TC.  *Id.* at 2-8.  Under the parties' plan, Microsoft was to respond to TDIs within certain time frames, depending upon their severity, but by January 2006, Plaintiffs reported that Microsoft had fallen significantly behind in meeting those guidelines and that the number of outstanding TDIs was mounting.  Pls' 1/23/06 Resp. to Microsoft Suppl. Status Report.  All Plaintiffs jointly condemned this slippage, advising the Court that "Microsoft need[ed] to dramatically increase the resources devoted to responding to technical documentation issues in order to get its performance under the [guidelines] back on track."  *Id.* at 2.

Based on all Plaintiffs' sharp criticism of Microsoft, "the frequent delays with the Troika project, [and] Microsoft's newfound disregard for the [TDI guidelines]," during its opening comments at the February 8, 2006 status conference, the Court voiced its "concern[] that Microsoft was neglecting a portion of its compliance obligations and promises."  2/8/06 Status Conf. Tr. at 6:5-10.  Throughout that status conference, the Court stressed the need "to make sure that . . . Microsoft [was] still carrying their end . . . in terms of making sure this actually works," particularly given the TC's continued assumption of responsibilities originally undertaken by Microsoft.  2/14/06 Status Hrg. Tr. at 17:11-18 (noting that "if [the TC's] been able to do it, I don't understand why Microsoft hasn't been able to").  In addition, the Plaintiffs–again led by the

33

California Group–denounced what they viewed as a "lack of commitment and seriousness with which Microsoft takes its obligations here." *Id.* at 35:14-41:15. At that point in time, however, the Court's concerns were assuaged in part by Microsoft's announcement of a "new significant step to facilitate its communications protocol licensing, namely Microsoft's plan to license the Windows source code at no extra cost to the licensees and to provide them with training." *Id.* at 6:22-7:5. As a result of this development, the Plaintiffs determined that rather than address TDIs to Microsoft, the TC would attempt to resolve them itself using the Windows source code, and would only bring concerns to Microsoft's attention if it found itself unable to do so. 2/8/06 JSR at 4-7

Unfortunately, what had seemed so promising in February 2006 again proved ineffective. Rather than declining, the number of outstanding TDIs continued to rise, and Microsoft remained unable to promptly resolve open TDIs identified by the TC. 5/12/06 JSR at 3-5. By May 2006, the parties' efforts towards implementing Section III.E reached a crisis point, as the delays stretched on and it became increasingly obvious that the available technical documentation was far from the type of quality product envisioned by Section III.E. *Id.* In response to mounting pressure from the Court and all of the Plaintiffs, Microsoft finally acknowledged that a new approach to the technical documentation was necessary, along with more resources. *Id.* at 4. As a result, Microsoft brought in a high-level executive, Robert Muglia, Senior Vice President of Microsoft's Server and Tools Business, to analyze the lack of success in implementing Section III.E and to "determine the most efficient method for producing technical documentation that is of a sufficiently high quality to assure Plaintiffs and the TC that Microsoft is meeting its obligations to licensees." *Id.* at 6. Mr. Muglia "and his team ultimately concluded that the

34

current process of trying to fix issues identified by the TC one at a time was unlikely, in the foreseeable future, to result in [satisfactory] documentation." *Id.*

Microsoft therefore determined that "a broader 'reset' would be much more effective and efficient, meaning that Microsoft [would] rewrite substantial portions of the documentation," *id.*, in order to "describe the protocols in a context in which they [would] be implemented by people [with] limited knowledge of Windows," 5/17/06 Status Hrg. Tr. at 39:9-18.  At the May 17, 2006 status conference, which focused on the RESET plan, Microsoft admitted that prior to the RESET plan, it "didn't have the exact right resources, [and] didn't have the right process in place." *Id.* at 39:3-8.  Microsoft also acknowledged that it added significant resources to the technical documentation project in early 2006.  *Id.*  Indeed, while Microsoft originally devoted only ten employees to the technical documentation project, *see* 7/3/03 JSR at 22, by May 2006, over 210 employees were involved in Microsoft's technical documentation efforts, including 150 product team engineers and program managers.  5/12/06 JSR at 19-20.[26]

The RESET plan undertaken in May 2006 was accompanied by the parties' joint request that the Court extend Section III.E of the Final Judgment and certain related sections until November 12, 2009 to "ensure that all necessary work on the documentation [could] be completed and that current and future MCPP licensees [would] have a substantial period of time

---

[26] The insufficiency of the resources Microsoft originally devoted to technical documentation project is clear from Microsoft's latest Supplemental Status Report, which states that "[a]pproximately 630 Microsoft employees and contingent staff are involved in work on the MCPP technical documentation," along with Microsoft's protocol documentation efforts for the European Commission, and that "approximately 320 product team engineers and program managers are actively involved in the creation and review of the technical content of the [MCPP] documentation."  1/15/08 MS Suppl. Report at 6.

to make use of the revised documentation." *Id.* at 10-13; *see also* Joint Motions to Modify the

Final Judgments. The parties' agreed-upon extension, which the Court approved in September

2006, extended Sections I, II, III.E, III.F.1, III.F.3, III.I, III.J, IV, V, VI, VII, and VIII of the Final

Judgments until November 12, 2009, and incorporated an agreement between Plaintiffs and

Microsoft "that Plaintiffs have the right in their sole discretion to request an additional three-year

extension of the extended portions of the decree until November 12, 2012, and that Microsoft

will not oppose any such request." NY/MS Joint Mot. to Modify the Final Judgment at 2-3.

Along with the extension, Microsoft agreed that "even if the Final Judgments expire[d]

completely in November 2009, it [would] continue, through November 11, 2012, to make the

protocols included in the MCPP available for license on reasonable and non-discriminatory terms

with a term of at least five years," such that "industry members [would] effectively have the

ability to license protocols through at least November 11, 2017." 5/12/06 JSR at 10.

Since May 2006, the parties have diligently worked toward implementing the RESET

plan. The TC has found the rewritten documentation emerging as a result of the RESET plan to

be a vast improvement over the previous two forms of technical documentation created by

Microsoft, and the Plaintiffs have reported that they are encouraged by this progress. *See*

*generally* 8/30/06 JSR and 11/21/06 JSR. In addition, as of the parties' last Joint Status Report,

a total of 41 companies were licensing Communications Protocols pursuant to § III.E of the Final

Judgments and 13 licensees were shipping products under the MCPP. 8/31/07 JSR at 6.

However, even the RESET plan's path has not been completely without pitfalls. Most

significantly, in February 2007, Microsoft reported that it had conducted an internal audit and

"determined that there [were] a number of protocols that [had to] be documented in addition to

36

those [Microsoft] originally planned" to document.  3/5/07 JSR at 5.  Microsoft projected that the overall time line for the RESET plan would have to be delayed by two months to allow for documentation of those protocols.  *Id.*

Again, Plaintiffs–the United States along with the state plaintiffs–voiced their concern about the delay in Section III.E's full implementation.  At the March 12, 2007 Status Conference, the parties reported another agreement designed to address Plaintiffs' continuing problems with the delay.  *See generally id.*; 3/12/07 Status Hrg. Tr.  This plan involved two "audits" of Microsoft's internal audit: one third-party consulting firm would review Microsoft's audit process, while a second consulting firm would attempt to develop programmatic methods for searching the Windows source code to identify additional communications protocols that should have been considered for inclusion in the MCPP.  *See generally* 3/5/07 JSR; 3/12/07 Status Hrg. Tr.  Finally, the parties negotiated a possible extension of the royalty holiday in place for MCPP licenses until the Plaintiffs deemed the technical documentation "substantially complete."  *See generally* 3/5/07 JSR; 3/12/07 Status Hrg. Tr.

As of the last status conference held in this case on September 11, 2007, Microsoft had released all initial versions of the rewritten technical documentation to the TC for testing, but the TC and Plaintiffs were far from concluding that the documentation was "substantially complete."  8/31/07 JSR.  The parties and the TC continue to conduct intensive testing of the technical documentation, and to review the corresponding overview/reference materials that Microsoft makes available to licensees.  *Id.*  In addition, while the first consulting firm's audit of Microsoft's internal audit is complete, the second consulting firm's efforts are ongoing.  *Id.* at 4.  Further, in its January 15, 2008 Supplemental Status Report, Microsoft reported that it is still in

discussions with the TC regarding the overview/reference materials, and that testing of the rewritten documentation continues, with over 900 TDIs outstanding against the new documentation.  1/15/08 MS Suppl. Report at 2-5.

Based on the foregoing history, it is abundantly clear that more than five years after the Communications Protocols and related technical documentation were required to be available to licensees under § III.E, the documentation envisioned by that Section is still not available to licensees in a complete, useable, and certifiably accurate form.  Although the technical documentation project is complex and novel, it is clear, at least to the Court, that Microsoft is culpable for this inexcusable delay.  To be sure, the delay has developed in stages, and at each step Microsoft commendably has been willing to work with the Plaintiffs and the TC to address their issues and identify a means of resolving them.  The parties' negotiations, in turn, have achieved a worthy goal by obviating the need for compliance-related litigation.[27]  Quite simply, because the parties have negotiated solutions to each of the myriad issues arising under Section III.E, the Court has never been asked to find Microsoft out of compliance with Section III.E, and has not deemed a *sua sponte* finding of non-compliance necessary or fruitful in achieving compliance.

Nevertheless, practically speaking, Microsoft has never complied with Section III.E. Furthermore, Microsoft did not proactively bring the problems with its technical documentation

---

[27] Of course, if the parties had not been able to negotiate the RESET plan when the Section III.E issues reached a crisis point, Plaintiffs would have been entitled–pursuant to Section V.B of the Final Judgments–to commence an enforcement proceeding and, in the event that "the Court found that Microsoft ha[d] engaged in a pattern of willful and systematic violations," to "apply to the Court for a one-time extension of th[e] Final Judgment[s] of up to two years," i.e., until November 12, 2009.  *See* Final Judgments, § V.B.

to the Court's attention.  Instead, the majority of the issues relating to Section III.E that have

arisen over the years have been identified by the Plaintiffs, through the efforts of the TC.  While

Microsoft eventually proposed the RESET plan, and has since cooperated in carrying it out, it did

so in the face of mounting pressure from all Plaintiffs and the Court.  In addition, there is no

reason why the type of documentation finally being created under the RESET plan could not

have been created from the outset if the necessary resources had been devoted.  Clearly, the

documentation finally emerging from the RESET plan is not the result of any changes in the

relevant market or technological advances over the past five years; rather, it might have been

developed earlier with the right resources and approach.  Microsoft essentially admitted as much

during the May 17, 2006 status conference when it acknowledged that it "didn't have the exact

right resources [or] the right process in place" prior to the RESET plan.  5/17/06 Status Hrg. Tr.

at 39:3-8; *see also id.* at 29:19-30:13 (California Group comment that the "essence of the

problem seems to be . . . insufficient planning at the outset of the [technical documentation]

project.").[28]  While the Court is cognizant that Section III.E required Microsoft to document

protocols that had never before been documented (as opposed to § III.D, which only required

Microsoft to expand its documentation of APIs), *see id.* at 37:6-38:19, Microsoft should have

recognized the problems with its documentation attempts earlier, and directed the appropriate

---

[28] Again, the Court notes that while Microsoft now reports that "[a]pproximately 630
Microsoft employees and contingent staff are involved in work on the MCPP technical
documentation," with "approximately 320 product team engineers and program managers []
actively involved in the creation and review of the technical content of the documentation,"
1/15/08 MS Suppl. Report at 6, it originally devoted only ten employees to the project of creating
the necessary technical documentation.  *See* 7/3/03 JSR at 22.  Even as of Microsoft's March 15,
2006 Supplemental Status Report–filed more than three years after the technical documentation
was originally anticipated to be released–a total of approximately 83 Microsoft employees
worked either full- or part-time on the documentation effort.  3/15/06 MS Suppl. Report at 9-10.

resources towards creating the necessary documentation.

In considering the Moving States' motions to extend the Final Judgments, the Court must evaluate the facts as they are at this point in time. To that end, while the Court certainly commends Microsoft for its willingness to cooperate with Plaintiffs and negotiate solutions throughout the past five years, the fact remains that when the Final Judgments were entered, the parties and the Court anticipated that the documentation required under Section III.E would be available, at the latest, by February 2003. Instead, almost five years later, Section III.E, which was meant to be "the *most* forward-looking provision" of the Final Judgment, *Remedy Opinion*, 224 F. Supp. 2d at 173, has yet to be fully implemented. At least as significantly, because of the delay, the various provisions of the Final Judgments have never been given an opportunity to operate together as the Court and the parties envisioned when the Final Judgments were entered. *See Settling States Opinion*, 231 F. Supp. 2d at 259 ("Far from an amalgam of scattered rules and regulations pieced and patched together to restrict Microsoft's anticompetitive business conduct, the [Final Judgment] adopts a clear and consistent philosophy such that the provisions form a tightly woven fabric.") (incorporating *Tunney Act Opinion*); *see also* United States' Resp. to Public Comments, Docket No. [699], at 205 ¶ 413 ("it is the overall impact of the various decree provisions working together over the course of the five-year term that will restore competitive conditions in the market.").

E.    *The Moving States' Motions*

At the March 13, 2007 status conference in the consolidated cases, the California Group reported to the Court that it intended to undertake an effort to survey MCPP licensees regarding their experiences with, and the impact of, the Final Judgments. 3/13/07 Status Hrg. Tr. at 31:3-

32:17.  Also during that status conference, the Court requested that all of the Plaintiffs begin to review the various sections of the Final Judgments and raise at the next status conference any issues that might need attention before the Final Judgments' then-impending expiration in November 2007.  *Id.* at 67:10-68:21.  The California Group presented an interim report on the results of its survey in the June 19, 2007 Joint Status Report, and during the June 26, 2007 status conference, the parties expressed their intent to provide the Court with reports reflecting their respective positions on the overall effectiveness of the Final Judgments.  *See* 6/19/07 JSR at 11-15.  On August 30, 2007, the Court received three such reports: the California Group filed a Report on Remedial Effectiveness; the New York Group and the United States filed a Joint Review of the Final Judgments; and Microsoft filed a Report Concerning the Final Judgments.

During the September 11, 2007 status conference, the California Group announced its intent to file a motion asking the Court to extend all provisions of its Final Judgment, other than § III.B, through November 2012.  *See generally* 9/11/07 Status Hrg. Tr. at 27:3-29:10; 36:22-56:13.  At that same status conference, the Court indicated that it was reserving all comments on the effectiveness of the Final Judgments until the expected November 2007 expiration of many provisions, but made some observations regarding the "background against which the final judgment was entered," and indicated that any request to extend the Final Judgments would have to be "for an identifiable purpose."  *Id.* at 31:5-36:21.

The California Movants filed their Motion to Extend on October 16, 2007, and on October 18, 2007, the New York Movants filed their Motion to Alter Judgment, joining the California Movants' request for an extension.  On October 19, 2007, the United States filed a Report indicating that they would not move to extend the Final Judgment in *United States v.*

41

*Microsoft*.  Accordingly, the Final Judgment in *United States v. Microsoft* lapsed on November

12, 2007.  On October 23, 2007, the Court held a telephone conference on the record with all

parties regarding the need for thorough briefing on the Moving States' motions.  On October 30,

2007, the New York Group, the California Group, and Microsoft filed–and the Court granted–a

Joint Motion to extend the Expiring Provisions of the Final Judgments "only for so long as

necessary (but no longer than January, 31, 2008) to allow" the Court to properly consider the

pending motions to extend.  Pursuant to a schedule agreed upon by the parties and the Court,

Microsoft filed its Opposition to the Moving States' motions on November 6, 2007, the United

States filed a Motion for Leave to Participate as *Amicus Curiae* and a proposed *amicus* brief on

November 9, 2007, and the Moving States filed a joint Reply on November 16, 2007.

Having reviewed all of the foregoing filings, on December 10, 2007, the Court issued an

Order directing the Moving States and Microsoft to file additional briefing on a "very targeted"

issue regarding the relation between Section III.E and the other provisions of the Final

Judgments.  As ordered, the Moving States filed their additional Memorandum on December 18,

2007, and Microsoft filed its Opposition thereto on December 28, 2007.  Finally, on January 8,

2008, the Court ordered the Moving States to file a Reply to Microsoft's Opposition, addressing

a list of pointed questions.  The Moving States did so on January 11, 2008.  As such, the Moving

States' motions to extend finally are fully ripe for review.

## II: LEGAL STANDARD

The Moving States and Microsoft disagree over the appropriate legal standard to apply to

the Moving States' motions to extend.  Before turning to that issue, however, the Court addresses

a more fundamental one: the source of the Court's authority to modify the Final Judgments as the

Moving States request.  The Court concludes that its authority to make such a modification

derives from two independent sources: (1) the Court's retained jurisdiction under the Final

Judgments; and (2) the Court's authority to modify the terms of a decree, which is largely

embodied in Federal Rule of Civil Procedure 60(b).

As this Court noted in the *Settling States Opinion*:

> The D.C. Circuit [has] made clear that "district courts enjoy no free-ranging
> 'ancillary' jurisdiction to enforce consent decrees, but are instead constrained by
> the terms of the decree and related order."  *Pigford v. Veneman*, 292 F.3d 918,
> 924 (D.C. Cir. 2002).  The *Pigford* [*v. Veneman*] court further explained that the
> district court's power over a consent decree, reflecting the hybrid between judicial
> order and contract, is limited to two sources.  A district court may interpret and
> enforce a decree to the extent authorized by the decree itself or by the related
> order.  *Id.* at 923.  Additionally, a district court may modify a decree pursuant to
> Rule 60(b)(5) of the Federal Rules of Civil Procedure.  *Id.*

*Settling States Opinion*, 231 F. Supp. 2d at 257-58 (incorporating *Tunney Act Opinion*).  It was

for precisely this reason that the Court conditioned its approval of the consent decrees upon the

"Court's retention of jurisdiction [being] clearly articulated and broadly drawn."  *Id.* at 258.

The resulting "broadly drawn" retention of jurisdiction clause vests the Court with

authority to modify any provision of the Final Judgments upon application by any party.  Final

Judgments, § VII.[29]  Indeed, the retention of jurisdiction provisions of the Final Judgments are

strikingly different from the provision in *Pigford v. Veneman*, which was "limited by its plain

---

[29]  Each Final Judgment states that it will expire five years after being entered by the
Court "[u]nless this Court grants an extension," Final Judgments, § V.A., and provides that the
Court retains jurisdiction to "act *sua sponte* to issue further orders or directions, including but not
limited to orders or directions relating to the construction or carrying out of this Final Judgment,
the enforcement of compliance therewith, the modification thereof, and the punishment of any
violation thereof," as well as "for the purpose of enabling either of the parties . . . to apply to this
Court at any time for further orders and directions as may be necessary or appropriate to carry out
or construe [the] Final Judgment, to modify or terminate any of its provisions, to enforce
compliance, and to punish violations of its provisions," *id.*, § VII.

language . . . to situations involving decree violations." 292 F.3d at 924.  Significantly, the Final

Judgments specifically provide that the Final Judgments will expire *unless* the Court grants an

extension, and thus clearly contemplates the Court's authority to do so.  Final Judgments, § V.A;

*Cf. Stewart v. O'Neill*, 225 F. Supp. 2d 6, 8-9 (D.D.C. 2002) (clause provided for court to retain

jurisdiction over an action for a set period of time for enforcement purposes, with the agreement

to expire after that period of time).  Above and beyond that authority, the Final Judgments also

vest the Court with jurisdiction to "act *sua sponte* to issue further orders or directions, including

but not limited to orders or directions relating to the construction or carrying out of this Final

Judgment, the enforcement of compliance therewith, the modification thereof, and the

punishment of any violation thereof."  Final Judgments, § VII.

 Furthermore, the Court notes Microsoft's implicit suggestion that the Court's authority to

extend the Final Judgments arises exclusively from § V.B, which allows the Plaintiffs to apply to

the Court for a one-time extension of up to two years "[i]n any enforcement proceeding in which

the Court has found that Microsoft has engaged in a pattern of willful and systematic violations."

*Id.*, § V.B.  Plaintiffs do not invoke § V.B in seeking to extend the Final Judgments, nor does the

Court.  Nevertheless, Microsoft proffers no evidence that § V.B represents the sole avenue for an

extension of the Final Judgments, and the Court finds no such limitation in the broad retention of

jurisdiction and termination provisions of the Final Judgments.  The Court thus concludes that it

has the power to modify the Final Judgments pursuant to its express authority retained under the

Final Judgments.

 The Court may also modify the Final Judgments under its power in "equity to modify a

decree of injunctive relief," which the D.C. Circuit has described as "long-established, broad, and

flexible." *United States v. Western Electric Co.*, 46 F.3d 1198, 1202 (D.C. Cir. 1995)

(hereinafter "*Western Electric*") (quoting *New York States Ass'n for Retarded Children, Inc. v.*

*Carey*, 706 F.2d 956, 967 (2d Cir.)).  The parties agree that it is irrelevant to the exercise of this

power whether the decree in question is the result of litigation or consent.  *See United States v.*

*Swift & Co.*, 286 U.S. 106, 114 (1932) ("We are not doubtful of the power of a court of equity to

modify an injunction in adaptation to changed conditions, though it was entered by consent . . . .

The result is all one whether the decree has been entered after litigation or by consent."); *see also*

*Western Electric*, 46 F.3d at 1205 ("A consent decree, in other words, is subject to modification

to the same extent as if it had been entered as a final judgment after a full trial.").  The Moving

States and Microsoft do, however, disagree as to the standard the Court should apply in

exercising this power.

    The Moving States argue that the Court "is granted broad discretion to modify a decree in

order to accomplish its intended result."  CA Mem. at 7.  In so arguing, they rely upon *Western*

*Electric*, in which the D.C. Circuit stated that "[a]t the request of the party who sought the

equitable relief, a court may tighten the decree in order to accomplish its intended result," 46

F.3d at 1202 (citing *United Shoe*, 391 U.S. at 252), as well as *United Shoe* itself, in which the

Supreme Court concluded that an antitrust decree could be modified at the request of a

government enforcer where it had not "after 10 years, achieved its 'principal objects,'" 391 U.S.

at 251-52.  The Moving States also cite to *Chrysler Corporation v. United States*, 316 U.S. 556

(1942), in which the Supreme Court affirmed the extension of an antitrust consent decree and

stated that the relevant "test to be applied . . . is whether the change served to effectuate or to

thwart the basic purpose of the original consent decree."  *Id.* at 562.  According to the Moving

States, the extension they seek is necessary to give the Final Judgments "an opportunity to achieve the objectives that were endorsed by the Court of Appeals but have not yet been realized." CA Mem. at 3. In contrast, Microsoft argues that, even if the Court applies a standard derived from *United Shoe*, the Moving States fail to carry their burden because they cannot demonstrate that the Final Judgments have not achieved their "principal objects." MS Opp'n at 7-8.

For its part, Microsoft asserts that the "relevant standard for modifying decrees was articulated by the United States Supreme Court in *Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367, 383 (1992), and subsequently applied by the D.C. Circuit in *Pigford v. Veneman*." MS Opp'n at 6. Under that standard, "a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Rufo*, 502 U.S. at 383. "Modification of a consent decree may be warranted when changed factual conditions make compliance with the decree substantially more onerous," "when a decree proves to be unworkable because of unforeseen obstacles," "or when enforcement of the decree without modification would be detrimental to the public interest." *Id*. at 384-85 (citations omitted). For purposes of determining whether "unforeseen obstacles" amount to "changed circumstances," "*Rufo*'s modification standard does not require absolute unforseeability. It is enough that the parties did not actually contemplate the changed circumstances." *Evans v. Williams*, 206 F.3d 1292, 1298 (D.C. Cir. 2000). Furthermore, "[i]f the moving party meets [the changed circumstances] standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstances." *Rufo*, 502 U.S. at 383.

To be sure, *Rufo* is binding law, which the D.C. Circuit applied to motions to modify

46

consent decrees in *Western Electric* and *Pigford v. Veneman*, *see generally* 46 F.3d 1198 and 292 F.3d 918, and which the Supreme Court has indicated is equally applicable to a motion to modify an injunction, *see Agostini v. Felton*, 521 U.S. 203, 215 (1997). Still, as Judge Gladys Kessler recognized in *Cook v. Billington*, it is not entirely clear whether *Rufo* actually applies to the situation at issue in the instant case. *Cook v. Billington*, No. Civ. A. 82-0400 (GK), 2003 WL 24868169, at *2 (D.D.C. Sept. 8, 2003). Significantly, in *Western Electric*, the D.C. Circuit differentiated between requests made by "the party who sought the equitable relief," which it suggested are governed by the *United Shoe* standard, and requests made by the "enjoined party," which it stated "now come within Rule 60(b)(5)" and are governed by the *Rufo* standard. *Western Electric*, 46 F.3d at 1202; *Cook*, 2003 WL 24868169, at *2; *see also Holland v. New Jersey Dep't of Corrections*, 246 F.3d 267, 284 (3d Cir. 2001) ("*Rufo*, however, set the standard for cases in which the defendant seeks to have a decree modified, while in the case at bar it is the plaintiffs seeking modification. The Supreme Court has set a more rigorous standard for defendants seeking modification . . . .") (citing *United Shoe*, 391 U.S. at 249); *United States v. Local 560*, 974 F.2d 315, 331-32 & n.9 (3d Cir. 1992) (same). Focusing on this distinction, the Moving States maintain that *United Shoe* provides the proper standard where, as here "the government enforcers, as proponents of injunctive relief – rather than the enjoined defendant – seek modification to protect an antitrust judgment's effectiveness in restoring competition." Moving States' Reply at 11.

The Moving States are correct that the instant situation is qualitatively different from one in which an enjoined party seeks relief from a judgment, and that the Supreme Court cases discussed above suggest that a government enforcer may move to modify a consent decree in

order to "accomplish its intended result." *United Shoe*, 391 U.S. at 252. Moreover, Federal Rule

of Civil Procedure 60(b)(5), which permits the Court on "just terms," to "relieve a party or its

legal representative from a final judgment, order or proceeding . . . [if] applying it prospectively

is no longer equitable," Fed. R. Civ. P. 60(b)(5), does not inherently seem to apply when the

beneficiary of a decree seeks to extend the decree, rather than relieve itself of obligations.

Nevertheless, the Court is cognizant of the *Western Electric* court's acknowledgment that

Rule 60(b)(5) "has been described as 'little more than a codification of the universally recognized

principle that a court has continuing power to modify or vacate a final decree.'" 46 F.3d at 1202

(quoting 11 Charles A. Wright, et al., *Federal Practice and Procedure* § 2961 (1994)).

Similarly, in *Pigford v. Johanns*, the D.C. Circuit explained that "[a]s a practical matter, it makes

little difference whether the district court [resolves a motion to modify a consent order] under

Rule 60 or under its equitable authority as the standard for each is substantially the same."

*Pigford v. Johanns*, 416 F.3d 12, 16 (D.C. Cir. 2005). Significantly, although *Rufo* involved

institutional reform litigation, the D.C. Circuit extended its application to antitrust actions in

*Western Electric*. *See* 46 F.3d at 1202-03; *see also United States v. Eastman Kodak Co.*, 63 F.3d

95, 101-02 (2d Cir. 1995) (concluding that *Rufo* and *United Shoe* both bear upon a motion to

terminate an antitrust decree). And, subsequent to *Western Electric*, the D.C. Circuit applied the

*Rufo* standard in affirming a district court's ability to extend consent decree deadlines upon a

plaintiff's request. *See Pigford v. Veneman*, 292 F.3d at 925; *see also Cook*, 2003 WL

24868169, at *2.

In addition, courts in other circuits have recently applied *Rufo* to cases in which the

beneficiary of a consent decree sought to extend the decree's term or sought other modifications

to consent decrees. *See Thompson v. U.S. Dep't of Hous. & Urban Dev.*, 404 F.3d 821, 827-29 (4th Cir. 2005) (defendant's gross failure to fulfill its obligations under a consent decree constituted a "change of circumstance" sufficient to warrant an extension of the district court's jurisdiction over the decree); *David C. v. Leavitt*, 242 F.3d 1206, 1212-13 (10th Cir. 2001) (district court acted appropriately in granting "relief from the four-year Termination Provision by extending the term of the Agreement" "to allow [the defendant] to fulfill the very obligations it voluntarily undertook when it entered into the Agreement"); *see also United States v. Sec. of Hous. and Urban Dev.*, 239 F.3d 211, 217-18 (2d Cir. 2001) (affirming district court's modification of a consent decree where the defendant's non-compliance rendered the decree "unworkable because of unforseen [sic] obstacles," as well as "detrimental to the public interest."); *Vanguards of Cleveland v. Cleveland*, 23 F.3d 1013, 1019-20 (6th Cir. 1994) (affirming extension of consent decree where the expectations underlying the decree had failed to materialize).

In light of the foregoing, Microsoft may well be correct in arguing that *Rufo* applies to the instant case. Ultimately, however, the Court need not resolve this "thorny issue," *Cook*, 2003 WL 24868169, at *3, because the Court concludes below that the Moving States have met their burden under either *United Shoe* or *Rufo*. In this regard, the Court notes Microsoft's emphasis that "[m]odification of a decree or judicial order is an 'extraordinary' remedy that is appropriate only 'in very specific circumstances.'" MS Opp'n at 5 (quoting *Cook*, 2003 WL 2486869, at *3 and *Stewart*, 225 F. Supp. 2d at 9). Microsoft is certainly correct that modification requests must be approached "with caution." *Id.* (quoting *NLRB v. Harris Teeter Supermarkets*, 215 F.3d 32, 35 (D.C. Cir. 2000)). Microsoft is likewise correct–and the Court is aware–that modification of

a judgment is particularly significant where it "allows a party . . . to escape commitments voluntarily made and solemnized by a court decree."  MS Opp'n at 6 (quoting *Harris Teeter*, 215 F.3d at 35).  The parties should be assured that the Court does not undertake its decision regarding the Moving States' motions to extend lightly.  To the contrary, the Court has rigorously scrutinized the Moving States' arguments and only concludes that an extension of the Final Judgments is appropriate upon determining that they have carried their burden under both *United Shoe* and *Rufo*.

### III:  DISCUSSION

The Moving States' motions seek to extend the Final Judgments until November 12, 2012–five years beyond their original terms–and proffer a variety of arguments that such a lengthy extension is warranted pursuant to either *United Shoe* or *Rufo*.  Having carefully reviewed each of the Moving States' arguments in favor of extension, as well as Microsoft's Opposition thereto and the United States' *amicus* brief, the Court concludes that it is appropriate to extend the Expiring Provisions of the Final Judgments until November 12, 2009 due to the unforeseen delay in the implementation of Section III.E of the Final Judgments.

The Court therefore addresses the parties' arguments regarding the Section III.E delay first, before turning to the Moving States' other arguments in favor of extension.  Ultimately, the Court rejects the Moving States' other grounds, finding that their arguments are either foreclosed by the previous opinions of the trial court and the appellate court, or that they require premature speculation that does not meet the Moving States' burden under *United Shoe* and/or *Rufo*.

A.      *Extension of the Expiring Provisions Through 2009 is Appropriate Due to the Unforeseen Delay in the Implementation of Section III.E*

As detailed above, at the time that the Court entered the Final Judgments, all parties involved anticipated that the technical documentation required under Section III.E would be released, at the latest, by February 2003.  Instead, five years later, the rewrite of the technical documentation has only recently been completed, the corresponding overview/reference materials are not available to licensees, and the testing of the revised technical documentation is far from finished.  As such, no one can deny that licensees do not yet have access to a set of usable, accurate, and certifiably complete technical documentation, as contemplated by Section III.E and by the Court's various remedy-related opinions.

Nor can it be denied that, as a result of the delay in Section III.E's implementation, the provisions of the Final Judgments have not yet had the chance to operate together as a comprehensive remedy.  As the Moving States repeatedly stress, the Final Judgments were constructed as a unitary framework, with the various provisions intended to complement and reinforce each other.  *See* CA Mem. at 13-15; NY Mem. at 6 (quoting United States' Resp. to Public Comments ¶ 413 ("it is the overall impact of the various decree provisions working together over the course of the five-year term that will restore competitive conditions in the market.")).  Indeed, the Court's *Settling States Opinion* described the proposed consent decree as "[f]ar from an amalgam of scattered rules and regulations pieced and patched together to restrict Microsoft's anticompetitive business conduct," but rather a judgment that "adopts a clear and consistent philosophy such that the provisions form a tightly woven fabric."  *Settling States Opinion*, 231 F. Supp. 2d at 259 (incorporating *Tunney Act Opinion*).  The Court also clearly

51

acknowledged that Section III.E would not work in a vacuum when it stated that "in the absence of [Section III.E] *and the other prospective provisions* in the [Final Judgment], it is quite possible that the core of the decree would prove prematurely obsolete." *Settling States Opinion*, 231 F. Supp. 2d at 249 (incorporating *Tunney Act Opinion*) (emphasis added).

The delay in Section III.E's implementation, which has deprived the provisions of the Final Judgments the chance to operate together as intended, is entirely incongruous with the original expectations of the parties and the Court. As such, the delay, and the resulting impact on the Final Judgments' operation, constitute a "significant change in circumstances" that warrants extending the Expiring Provisions under the *Rufo* standard. *Rufo*, 502 U.S. at 383; *see also Thompson*, 404 F.3d at 827-29 (affirming extension of consent decree because "[g]iven that the [defendants] are so far behind in fulfilling their obligations under the Consent Decree and that many of the obligations of the parties are interrelated, the district court properly recognized the utility of retaining jurisdiction over [a defendant], so as to ensure that the Decree can be efficiently enforced."); *David C.*, 242 F.3d at 1211-12 (granting relief from termination provision of consent decree in order to allow defendant "to fulfill the very obligations it voluntarily undertook when it entered into the [decree]"); *Vanguards of Cleveland*, 23 F.3d at 1019-20 (affirming extension of consent decree where the expectations underlying the decree had failed to materialize).

*Rufo* explains that "[m]odification is [] appropriate when a decree proves to be unworkable because of unforeseen obstacles," *id.* at 384, and it is clear that the dramatic delay in the implementation of § III.E was entirely unforeseen by either the Court or the parties when the Final Judgments were entered. *Cf. Sierra Club v. Meiburg*, 296 F.3d 1021, 1033-34 (11th Cir.

52

2002) (reversing district court modification of consent decree where the defendant's failure to carry out its responsibilities was the very reason litigation was instituted in the first place). Indeed, Microsoft does not argue that anyone involved foresaw the delay at the outset, least of all Microsoft, and because the § III.E delay evolved gradually over time it could not have been foreseen at any particular point along the way.  As a result of the delay, it also appears that "enforcement of the decree without modification would be detrimental to the public interest." *Rufo*, 502 U.S. at 384.  To be sure, a "public interest" test does not apply when parties disagree over a proposed modification to a consent decree.  *See* MS Opp'n at 3, US *Amicus* Br. at 7; *see also United States v. Baroid Corp.*, 130 F. Supp. 2d 101, 103-04 (D.D.C. 2001).  However, the D.C. Circuit has concluded that *Rufo*'s flexible standard is appropriately applied in antitrust actions precisely because they may implicate the public interest.  *Western Electric*, 46 F.3d at 1203.  The Court's *Tunney Act Opinion* makes clear that the instant action, in fact, implicates the public interest, and that Section III.E's forward-looking nature is key to protecting that public interest.  *See Tunney Act Opinion*, 231 F. Supp. 2d at 191-92.

The Court cannot know what impact the technical documentation required by Section III.E will have on the market once it is finally available in a complete, accurate, and useable form.  Nevertheless, the Moving States highlight scenarios in which the Expiring Provisions of the Final Judgments might yet play a significant role in helping § III.E achieve its full potential. The Moving States focus on the possibility that an MCPP licensee who writes an application using software hosted on a server will also wish to add "software to the client to take advantage of the functionality that the server provides."  Moving States' Resp. to the Court's December 10, 2007 Order (hereinafter "Moving States' Dec. 10 Resp.") at 2-3.  The Moving States note, and

Microsoft agrees, that certain companies, including Apple, Yahoo!, and Google, are already making use of a product approach that involves both server-side and client-side components, albeit via internet standard protocols rather than Microsoft's proprietary protocols.  *Id.* at 3-4; MS Opp'n to Moving States' Dec. 10 Resp. at 2-3, 6-8.

The Moving States specifically suggest that in the future an MCPP licensee could "creat[e] a media server that uses the [MCPP] media protocols to support Microsoft media formats, while also supporting competing formats."  Moving States' Dec. 10 Resp. at 4. However, because the "licensee cannot rely on Microsoft's media player to read all of the formats," it "must develop its own player for the Windows client, or find third parties to develop compatible players."  *Id.*  The Moving States continue to explain how, in that scenario, the Expiring Provisions would support each other in maximizing the procompetitive impact of the server-side application developed using MCPP protocols: § III.A would prevent Microsoft from retaliating against an OEM for distributing the licensee's media player; § III.C would guarantee OEMs the freedom to place the media player on the Windows desktop and in menus; § III.D would give the licensee access to the APIs needed to create the media player; § III.F would protect the licensee if it sought to have a third-party ISV create the media player; § III.G would prevent Microsoft from entering into agreements aimed at excluding the competing media player; and § III.H would allow the end user to set the competing media player as a default.  *Id.* at 4-5.

Microsoft correctly points out that the development of the client-side product in the Moving States' examples is "well beyond the scope of Section III.E, . . . [and] beyond the scope of the MCPP license itself" because "[o]nce software is added to the client, the server and the application can communicate directly without the need for the proprietary protocols supported in

the Windows client."  MS Opp'n to Moving States' Dec. 10 Resp. at 5-6 & n.4.  Indeed, because

Section III.E only requires the disclosure of Communications Protocols that are "used to

interoperate, or communicate, natively (i.e., without the addition of software code to the client

operating system product) with a Microsoft server operating system product," the client-side

product in the Moving States' examples could not make use of protocols disclosed under Section

III.E.  *See* Final Judgments, § III.E.  But it is nevertheless true that an MCPP licensee could use

such protocols to develop a server product, and then seek to maximize the potential of that server

product in ways that require the protections of the remaining provisions of Section III.  In the

face of the Moving States' realistic examples, allowing the other provisions of the Final

Judgments to lapse before Section III.E has even been given a chance to succeed might threaten

the ability of the Final Judgments to achieve their full procompetitive impact.  Such an outcome

would certainly be detrimental to the public interest.

The foregoing discussion also demonstrates that the Section III.E delay has impeded the

Final Judgments from "accomplish[ing their] intended result" and "achiev[ing their] principal

objects."  *United Shoe*, 391 U.S. at 251-52.  The D.C. Circuit identified the objectives of the

Final Judgments as, *inter alia*, "unfetter[ing] a market from anticompetitive conduct," and

"ensur[ing] that there remain no practices likely to result in monopolization in the future."

*Microsoft*, 253 F.3d at 103 (quoting *Ford Motor Co.*, 405 U.S. at 577 (1972) and *United Shoe*,

391 U.S. at 250).  To that list, this Court's *Remedy Opinion* added "eliminat[ing] the

consequences of Microsoft's illegal conduct."  224 F. Supp. 2d at 173 (quoting *Nat'l Soc'y of

Prof'l Eng'rs v. United States*, 435 U.S. 679, 698 (1978)).  This Court further explained that it

expected Section III.E would serve the Final Judgments' forward-looking goals by "advancing

the ability of non-Microsoft server operating systems to interoperate, or communicate, with the ubiquitous Windows PC client," in order to "further the ability of these non-Microsoft server operating systems to provide a platform which competes with Windows itself." *Id.* at 172-73. As a result of the delay in the availability of technical documentation under Section III.E, it is obvious that the aims of that Section have yet to be completely realized.

Furthermore, the Court's *Remedy Opinion* makes clear that § III.E represents only one avenue towards achieving the Final Judgments' overall goals. Microsoft attempts to obscure this fact, arguing that the § III.E delay does not warrant an extension of the other provisions of Section III because "whereas Sections III.A, C, D, F, G, and H all deal with the treatment of middleware products *running on Windows*, Section III.E was designed to encourage development of platform alternatives *running on servers* (i.e., not running on Windows)." MS Opp'n at 16. While Microsoft is correct that Section III.E focused on servers while the other provisions of Section III focused on client-side applications, its argument demonstrates only that Section III.E took a different approach to achieving the Final Judgments' overall goals. Microsoft's argument thus does not negate the fact that the parties and the Court have always viewed Section III.E as just one means to the Final Judgments' overall ends. *See Settling States Opinion*, 231 F. Supp. 2d at 249 ("the protections in § III.E . . . not only redress[] the specific conduct found to violate the antitrust laws, but [] obtain protection which is prospective in its focus . . . In the absence of [§ III.E] *and the other prospective provisions* in the [Final Judgment], it is quite possible the core of the decree would prove prematurely obsolete.") (emphasis added); *see also Remedy Opinion*, 224 F. Supp. 2d at 173 ("the Court's remedy extends to the most apparent frontier in 'platform' threats to Microsoft's PC operating system monopoly . . . [§ III.E] *contributes* to the elimination

of the consequences of Microsoft's illegal conduct.") (internal citations omitted, emphasis added).

To the extent that Microsoft's argument suggests that Section III.E was forward-looking in nature, while the other provisions of Section III were solely retroactive, that inference is unsupported by either the text of the Court's remedy-related opinions, or the realities of the Final Judgments. It is certainly the case that the other provisions of Section III aimed to "end Microsoft's restrictions on potentially threatening middleware," but those provisions also sought to "prevent it from hampering similar nascent threats in the future, and restore the competitive conditions created by similar middleware threats." *Massachusetts v. Microsoft*, 373 F.3d at 1243. As such, they were intended to provide necessary protection to programs developed as a result of Section III.E, in the event that such protections became necessary. With the technical documentation still not fully complete, accurate, and usable, it is too early to say whether the other provisions of Section III will yet prove necessary in maximizing the potential of products developed under Section III.E. Based on the Moving States' examples, however, the Court is convinced that this option needs to be preserved.

Microsoft also argues that the Moving States have not carried their burden of demonstrating that the Section III.E delay necessitates an extension of the other provisions of Section III because they "make no effort to prove why the success of *each* specific provision of the Final Judgments is contingent on the continued operation of *every other* provision." MS Opp'n at 14. According to Microsoft, the Moving States cannot make such a showing because they agreed in the fall of 2006 to extend only Sections I, II, III.F.1, III.F.3, III.I, III.J, IV, V, VI, VII, and VII of the Final Judgments along with Section III.E. *Id.* at 14-15. The United States

57

agrees with Microsoft on this point.  *See* US *Amicus* Br. at 9-10.  In contrast, the Court agrees

with the Moving States that they did not waive their rights to seek additional relief under the

Final Judgments by agreeing to extend only certain provisions until November 2009.  As the

Moving States accurately describe the RESET plan and the corresponding extension of Section

III.E, it was a negotiated compromise designed to avoid litigation, without prejudice to any future

requests for modification.  *See* Moving States' Reply at 20-22.  Indeed, the parties' August 2006

motions in support of the extension do not hint at any waiver of Plaintiffs' rights under the Final

Judgments.  *Id.*; *see generally* NY/MS Joint Mot. to Modify and CA/MS Joint Mot. to Modify.

Instead, the California Group's motion to modify expresses a "hope that the additional time

provided Section III.E. under the Modified Final Judgment will result in technical documentation

that will better effectuate the remedy."  CA/MS Joint Mot. to Modify at 4.  In reality, of course,

more than a year has passed since the extension of Section III.E, and the technical documentation

contemplated by that Section is not yet certified as usable, complete, and accurate.  Under such

circumstances, the Court concludes that the Moving States are well within their rights to seek a

further extension of the Final Judgments.

　　　In any event, the Court rejects Microsoft's suggestion that the other provisions of Section

III should not be extended unless Section III.E would be doomed to fail in their absence.  MS

Opp'n at 14.  The Moving States' Response to the Court's December 10, 2007 Order concedes

that the provisions of Section III are "complementary, not interdependent," but nevertheless

argues that "the Final Judgment would be much less likely to achieve the as yet unfulfilled

remedial goals . . . if the only provision that remains in effect is § III.E."  Moving States' Resp. to

Dec. 10 Order at 10.  For its part, Microsoft does not point to language in any of the Court's

remedy-related opinions suggesting that each of the Final Judgments' provisions were expected

to work in isolation, and the Court is not aware of any such language.  To the contrary, the

Court's remedy-related opinions affirm, and the Court continues to agree, that the various

provisions of the Final Judgment were expected to work in tandem towards achieving the Final

Judgments' overall goals.  It is therefore sufficient that the other provisions support Section III.E,

even if Section III.E is not actually fully dependent upon them.

Finally, Microsoft suggests that it is not necessary to extend the Expiring Provisions of

the Final Judgments in order to support Section III.E because the "proliferation of Web-based

computing has, in effect, accomplished what Section III.E was designed to do, although not

exactly in the way that was anticipated in 2001 when Section III.E was created."  MS Opp'n at

16-17.  Without drawing conclusions as to the accuracy of Microsoft's statement, the Court notes

only that it does not establish that Section III.E has become irrelevant.  The Court recognizes that

the goals have been thwarted by the time that has been lost as a result of the delays, attributed

solely to Microsoft, in Section III.E's implementation, and understands that it cannot recreate the

opportunities that existed when the Final Judgments were entered.  Nevertheless, the Court

shares the Moving States' expectation that the MCPP will continue to attract licensees, *see* CA

Mem. at 12, and that once certifiably complete, accurate, and useable technical documentation is

available to those licensees they will develop products that "further the ability of [] non-

Microsoft server operating systems to provide a platform which competes with Windows itself,"

*Remedy Opinion*, 224 F. Supp. 2d at 173.  When such development occurs, it will presumably

amplify whatever progress the proliferation of Web-based computing has made towards

"eliminat[ing] the consequences of Microsoft's illegal conduct."  *Id.* at 173.

Microsoft's arguments thus fail to alter this Court's decision that an extension of the Expiring Provisions is warranted due to the delay in Section III.E's implementation and the inexorable conclusion that, as a result, the Final Judgments have yet to operate as a comprehensive whole. The Moving States' request would be viewed in a different light if certifiably complete, accurate, and useable technical documentation was already available to and in use by licensees. In that case, the Court would be in a position to evaluate the relevance of the Expiring Provisions to those licensees' efforts. Due to the delay, of course, that is not the current situation. Instead, Microsoft seeks to let the majority of Section III's protections lapse despite the fact that Section III.E–once described as the "*most* forward-looking provision" of the Final Judgments, *Remedy Opinion*, 224 F. Supp. 2d at 173–has yet to come to fruition. The Court, the parties, and the marketplace should not be deprived of the opportunity to realize the benefits that the Expiring Provisions can still play in effectuating the Final Judgments' goals. Based on the Moving States' examples of client-side applications that could be developed in connection with server products, the Court finds that the other provisions of Section III can yet serve to substantially increase the eventual procompetitive impact of Section III.E.

> B.      *The Moving States' Other Arguments In Favor of Extension Lack Merit*

In light of the Court's conclusion that the Section III.E delay and its repercussions on the Final Judgments' implementation warrant an extension of the Expiring Provisions under either *Rufo* or *United Shoe*, the Court need not tarry long over the Moving States' remaining, meritless, arguments for extensions. The Court therefore addresses each very briefly below, albeit not in the order presented by the Moving States.

First, the Moving States highlight the fact that no licensee has, as of yet, developed a

general server product under the MCPP, arguing that it constitutes a "changed circumstance" for purposes of the *Rufo* standard.  *See* Moving States Reply at 14-15; CA Mem. at 12.  In particular, the Moving States note that, according to the results of the California Group's survey, "MCPP licensees tend to develop products that complement, rather than compete with, Windows features." *Id.* (citing CA Group Rep. on Remedial Effectiveness; 6/19/07 JSR at 14).  The Moving States are correct that the Court concluded that the remedy in this case should encompass server/network computing due to the potential for "non-Microsoft operating systems to provide a platform which competes with Windows itself." *Remedy Opinion*, 224 F. Supp. 2d at 129-30, 172-73.  The Court's *Remedy Opinion*, however, also stressed that "it is particularly difficult in this case to predict what effect the present remedy will have [in the future]." *Id.* at 183-84.  As the Court's remedy was clearly aspirational, rather than premised upon certain benchmarks, the fact that no licensee has yet developed a general server product cannot represent a changed condition.  Nor does the lack of a general server product developed under the MCPP, in and of itself, demonstrate that the Final Judgment has not achieved its "principal objectives" under *United Shoe*.  Moreover, it is premature to draw any conclusions at this time as to the overall impact of the MCPP on the general server market.  As the California Group's Report on Remedial Effectiveness acknowledges, six companies have signed general server licenses.  CA Group Rep. on Remedial Effectiveness at 11 n.30.  Those companies may yet develop general server products, and more licensees may still execute general server licenses, before Section III.E expires in November 2009.

The Moving States similarly find a "changed circumstance" in the fact that no major OEM has pre-installed a rival browser to Microsoft's IE on its new PC systems.  CA Mem. at 16-

18; Moving States' Reply at 16-18.  The Moving States are correct that this Court and the D.C.

Circuit's remedy opinions projected that allowing "OEMs to disable end-user access to IE, and

thereby to avoid the costs of having to support both IE and a rival browser," would make OEMs

"more likely to install a rival browser based upon market determinants, such as consumer

demand," and "that OEMs' new freedom to respond to market demand would enhance

competition between Microsoft and other manufacturers of middleware."  *Massachusetts v.

Microsoft*, 373 F.3d at 1238-39; *see also Remedy Opinion*, 224 F. Supp. 2d at 158-59.  However,

the Final Judgments ensured OEMs' ability to load competing web browsers, as well as other

types of middleware, based on Plaintiffs' theory that the proliferation of non-Microsoft

middleware might reduce the applications barrier to entry.  Guaranteeing OEMs the freedom to

install rival web browsers was thus a means towards achieving the Final Judgments' overall

goals, rather than an end in and of itself.  Thus, the fact that no OEM currently pre-installs a

competing web browser does not demonstrate that the Final Judgments principal objectives have

not been met.[30]  Moreover, the Moving States do not dispute Microsoft's assertion that OEMs are

currently pre-installing non-Microsoft middleware (other than web browsers), *see* MS Opp'n at

21-22, and in fact describe this development as a "positive sign," Moving States' Reply at 17.

The Moving States' focus on the web browser market is also inappropriate for the even

more fundamental reason that the web browser market was not the relevant market for purposes

of the liability findings.  To the contrary, the D.C. Circuit concluded that the Plaintiffs failed, in

the liability phase, to establish the existence of a properly defined market for web browsers.

---

[30] In addition, as the United States points out, the Moving States "make no showing . . . that any conduct by Microsoft (either in violation of the decree or otherwise) has foreclosed the OEM channel to third-party browsers."  US *Amicus* Br. at 4.

*See Microsoft*, 253 F.3d at 81-82.  As such, the Moving States' emphasis on the web browser market appears to be an attempt at the proverbial second bite at the apple.  But, because the web browser market was not, in and of itself, the focus of the liability findings, the Court need not resolve the factual dispute between the Moving States and Microsoft as to Microsoft's alleged dominance of the web browser market.  *Compare* CA Mem. at 4-6 and NY Mem. at 2-3 with MS Opp'n at 22 n.22.  Similarly, the Court need not address Microsoft's factual challenge to the Moving States' assertion that Microsoft has "consolidated its hold on the server market" during the five years that the Final Judgments have been effect.  *See* CA Mem. at 3; MS Opp'n at 18 n.16.  Regardless of Microsoft's current share in the so-called "server market," as Microsoft correctly notes, "no such market was ever defined or addressed in the underlying theory of liability."  MS Opp'n at 18 n.16.

The Moving States attempt to gloss over the fact that neither web browsers nor servers were the relevant market for purposes of the liability findings in this case by asserting that Microsoft's alleged dominance of those markets nevertheless matters because emerging web-centric technologies are "dependent on web browsers and servers for access to consumers," and "require computer equipment running a client or server operating system."  CA Mem. at 6, 20-22.  According to the Moving States, the continuing dominance of IE and Windows offers Microsoft the ability "to use the browser as a chokepoint," *id.* at 5, so as "to impede the development of emerging middleware threats with the potential to erode the applications barrier to entry protecting its Windows monopoly," Moving States' Reply at 25.  The Court notes that the Moving States' claims in this respect are not undisputed, as one of the expert reports submitted in support of Microsoft's Opposition argues that Microsoft would have neither the

power nor the incentive to limit consumer access to internet technologies.  *See* MS Opp'n, Ex. A

(11/6/07 Suppl. Expert Rep. of Marco Iansiti).

In any event, the Court need not resolve this largely hypothetical factual dispute.  As

Microsoft acknowledges, if it were to use its alleged dominance in the web browser market in

order to stifle competing middleware, "such conduct would [likely] violate § 2 of the Sherman

Act, and Microsoft would remain subject to penalty under that statute."  MS Opp'n at 19.[31]  This

Court's *Remedy Opinion* previously recognized as much when it stated that "although Plaintiffs

*assume* that Microsoft will engage in anticompetitive conduct in the future in conjunction with

its participation in this emerging area of technology, this case cannot be used as a vehicle by

which to fight every potential future violation of the antitrust laws by Microsoft. . . . "  *Remedy*

*Opinion*, 224 F. Supp. 2d at 133.  Instead, the specters of hypothetical threats that the Moving

States raise "are more appropriately addressed as separate claims, in a separate suit, should

Microsoft engage in such conduct and should Plaintiffs deem it appropriate to file one."  *Id.* at

---

[31] The Moving States' argument that Microsoft may threaten emerging technologies
through its alleged dominance of the web browser market also appears quite similar to an
argument raised during the remedy proceeding that certain protections should be included in the
remedy to "ensure that Microsoft does not use its control over the browser market to control
other technology markets."  *Remedy Opinion*, 224 F. Supp. 2d at 241, n. 118.  That argument was
rejected in the *Remedy Opinion*, however, because it "reflect[ed] an attempt to argue either a new
attempted monopolization claim or the previously court-rejected 'monopoly leveraging' theory of
liability by extending that 'leveraging' argument to emerging areas of technology."  *Id.* (quoting
*United States v. Microsoft Corp.*, 1998 WL 614485, *26-28 (D.D.C. Sept. 14, 1998)).
Furthermore, in affirming this Court's remedy, the D.C. Circuit rejected an argument that
"Microsoft 'advantage[d] its own middleware by using the browser to limit the functionality of
competing products,'" concluding that this Court's remedy "properly focused . . . upon opening
the channels of distribution to . . . rivals," rather than eliminating "harm to specific competitors."
*Massachusetts v. Microsoft*, 373 F.3d at 1229.

134.[32]

Finally, the Court addresses the Moving States' claim that the Expiring Provisions should be extended because "in the relevant market, Intel-compatible PC operating systems, the rapid pace of change [anticipated by the Court during the remedy phase] has clearly not manifested itself." Moving States' Reply at 12, 28-31; CA Mem. at 19-20; NY Mem. at 2-4. Microsoft vehemently disputes this assertion, insisting that "major developments and innovation [have] taken place in connection with Windows," and that, more importantly, "[a] proper examination of the [software] industry since the Final Judgments reveals that innovation has been widespread, competition has been dynamic, and growth and innovation have outpaced the rest of the economy by a wide margin." MS Opp'n at 25, 27.

Again, the Court concludes that resolution of this factual dispute is unnecessary, and indeed inappropriate. As an initial matter, insofar as the Moving States' argument is premised on their assertion that "Microsoft's share of the PC operating system market has been greater than 90% for at least the past 15 years," CA Mem. at 4, it is entirely misplaced. The Court's *Remedy Opinion* reiterated that "the monopoly in this case was not found to have been illegally acquired,

---

[32] To the extent that the Moving States suggest that the key to protecting emerging web-based middleware threats is to ensure that Microsoft "maintains IE as a standards-compliant browser," *see* CA Mem. at 20-21, that argument is foreclosed by this Court's *Remedy Opinion*. As Microsoft correctly notes, the Court considered and rejected a "requirement that Microsoft maintain support for industry standards where it has made proprietary modifications to the standards," because that conduct "was found . . . to have competitive benefits which outweigh the anticompetitive effect of the conduct," because the proposed requirement was "likely to have only a modest effect on competition, if at all," and because it "impose[d] unworkable conditions." *Remedy Opinion*, 224 F. Supp. 2d at 190-91. Significantly, the D.C. Circuit specifically affirmed this Court's conclusion in that respect, holding that "the district court permissibly refused to require that Microsoft continue to support a standard after making a proprietary modification to it, even if the modification makes the standard incompatible with the original." *Massachusetts v. Microsoft*, 373 F.3d at 1215.

but only to have been illegally maintained." 224 F. Supp. 2d at 100-01 (quoting *Microsoft*, 253

F.3d at 46, 107).  As such, the Court concluded, and the parties conceded, that it was not "a valid

objective for the remedy in this case to actually 'terminate' Microsoft's monopoly.  Rather, the

proper objective of the remedy in this case [was] termination of the exclusionary acts and

practices related thereto which served to illegally maintain the monopoly." *Id.* at 101; *see also*

*Settling States Opinion*, 231 F. Supp. 2d at 211 n.4 (incorporating *Tunney Act Opinion*) (internal

citations omitted).  Viewed in the proper context, then, Microsoft's alleged current share of the

PC operating system market is simply not the measure used to determine whether the Final

Judgments have achieved their principal objectives.

The Moving States' focus on the "pace of change" in the relevant market likewise cannot

support an extension of the Expiring Provisions of the Final Judgments.  It is correct that this

Court's selection of a five-year term for the Litigating States' remedy and approval of the same

term in the Settling States' consent decree turned on an understanding that "the industry at issue

in this case is remarkable for its constant and rapid change." *Remedy Opinion*, 224 F. Supp. 2d

at 184; *Settling States Opinion*, 231 F. Supp. 2d at 252-53.  However, the Court did not set any

benchmark expectations for the industry and, to the contrary, noted the "substantial uncertainty as

to the future demands of the software industry." *Remedy Opinion*, 224 F. Supp. 2d at 183.  The

Court thus did not predicate the success of the Final Judgments on the anticipated developments

in the relevant market.  Nor should such changes provide the measure for determining whether an

extension is appropriate, as that measuring stick is subject to unpredictable pressures and

influences that would open the door to potentially endless extensions.  Such an outcome would

indeed be contrary to the policy favoring eventual finality in court oversight of judgments.

66

C.      *Microsoft's Additional Arguments Against Extension*

Having addressed the Moving States' main arguments for extending the Expiring

Provisions, the Court now considers the arguments raised by Microsoft against that outcome, to

the extent they are not addressed above.

Microsoft asserts that its "compliance with the expiring provisions of the Final Judgment,

its history of going beyond its obligations to resolve issues raised by the Plaintiffs and the [TC],

and its commitment to adhere to Final Judgment principles on a going-forward basis" are

grounds for denying the Moving States' motions and relieving Microsoft of the burden of

"operating under the shadow of a judicial decree."  MS Opp'n at 11 (citing Windows Principles:

Empowering Choice, Opportunity, and Interoperablity, *available at* http://www.microsoft.com

/about/corporatecitizenship/ citizenship/businesspractices/windowsprinciples.mspx (published

Aug. 24, 2007)).  The Moving States attempt to downplay Microsoft's claim by asserting that

"Microsoft itself should hardly be heard to object to extending the decree" because it "professes

to be 'committed to running its Windows business in accordance' with [the Windows

Principles]" and because it "conceded, in the case brought by the European Commission, that the

settlement in this litigation has not 'had any negative impact on its incentives to innovate.'" NY

Mem. at 7; CA Mem. at 22 & n.22.

The Moving States arguments in this regard are not well-taken.  Microsoft's commitment

to the Windows Principles is admirable, and certainly should not be held against Microsoft.

Furthermore, the Court is well aware that operating under a judicial decree has negative

connotations.  *See* MS Opp'n at 11.  The Court nevertheless concludes, for the reasons detailed

above, that an extension of the Expiring Provisions is warranted due to the delay in Section

III.E's implementation and the impact of that delay on the Final Judgments' operation.

Microsoft next argues that the New York Movants are on shaky ground because their August 30, 2007 Review of the Final Judgments, filed jointly with the United States, concluded that the Final Judgments had achieved their goals. US *Amicus* Br. at 5-7; MS Opp'n at 8. The New York Movants address any apparent inconsistency by explaining that their earlier filing was not a "mission accomplished" pronouncement. Moving States' Reply at 23. According to the New York Movants, while they believe the Final Judgments are "accomplishing their stated goal of fostering competitive conditions . . . [t]here is still much work for the Court's Final Judgments to do." *Id.* (quoting NY Group Review of Final Judgments at 6, 8). The Court agrees with the New York Movants that their positions are not inherently inconsistent and that, in any event, their Review of the Final Judgments in no way waived their right under their Final Judgment to seek the additional relief they now believe is warranted.

Microsoft further asserts that, as a party to a negotiated consent decree, the New York Movants should not be able to escape the five-year term of that decree, because the decree should be accorded the weight of a binding contract. MS Opp'n at 8. The United States echoes Microsoft's argument in its *amicus* brief. US *Amicus* Br. at 5-7. The Court certainly recognizes that modification of a consent decree is an "extraordinary remedy." *See Harris Teeter Supermarkets*, 215 F.3d at 35). However, it must also be acknowledged that the consent decree in this instance is unusual in that it was not reached as an alternative to a finding of liability. Rather, the consent decree addressed only the remedy phase of this case, and was negotiated based on the D.C. Circuit's findings of liability and guidance as to the parameters of an appropriate remedy. Further, the consent decree shared the same purpose, and reflects the same goals, as the court-

ordered Litigated States' remedy.  This fact is reflected by the Court's conclusion in the *Tunney Act Opinion* that the proposed consent decree "takes account of the theory of liability advanced by Plaintiffs, the actual liability imposed by the appellate court, the concerns of the Plaintiffs with regard to future technologies, and the relevant policy considerations."  *Settling States Opinion*, 231 F. Supp. 2d at 259 (incorporating *Tunney Act Opinion*).

Just as the consent decree and court-ordered remedy had the same goals, so did their identical Sections III.E play the same role within the two Final Judgments.  And, as noted above, the Court's power to modify an injunction or grant relief from a judgment is the same regardless of whether a consent decree or litigated decree is at issue.  *Agostini*, 521 U.S. at 215;  *Swift*, 286 U.S. at 114; *Western Electric*, 46 F.3d at 1205.  As a result, the Court's conclusions regarding the unforeseen nature of the Section III.E delay and its impact on the implementation of the Final Judgments are of equal import with respect to each Final Judgment.  Moreover, the New York Movants convincingly argue that, even if the Court regards their consent decree as a binding contract, they "have yet to realize the benefit of their 'bargain' because Microsoft still has not fulfilled its § III.E disclosure obligations, an important inducement to settle the litigation." Moving States' Reply at 26.

Finally, continuing with its argument that the New York consent decree is a binding contract, Microsoft argues that it "should not be forced to endure more than [it] bargained for," given its overall compliance with the Expiring Provisions and its cooperation with the Plaintiffs and TC over the past five years.  MS Opp'n at 11.  According to Microsoft, if the New York Movants are allowed to unilaterally extend the expiring provisions, it will deter parties from negotiating consent decrees and from going "beyond the letter of their decree obligations."  *Id.* at

11-12.  The United States and Visa and Weyerhaeuser echo Microsoft's concern in their

respective *amici* briefs.  US *Amicus* Br. at 7; *see generally* Visa/Weyerhaeuser *Amici* Br.  In that

regard, the Court notes that *Rufo* considered and rejected an argument that its flexible standard

"would deter parties to litigation . . . from negotiating settlements."  502 U.S. at 382-83.  In so

doing, the Supreme Court reasoned–and this Court agrees–that parties who negotiate consent

decrees do so with the knowledge that "the prospective effect of such a judgment or decree will be

open to modification where deemed equitable under Rule 60(b)" and that "[w]hether or not

[parties] bargain for more than they might get after trial, they will be in no worse position if they

settle and have the consent decree entered."  That point is demonstrated clearly here by the

overwhelming similarity between the Settling States' and Litigating States' Final Judgments.

The Court is nevertheless sensitive to the policy argument made by Microsoft and *amici*,

and therefore stresses that its decision to extend the Expiring Provisions of the Final Judgment

must be viewed in the proper, extremely unique, context.  Not only is this case unique, in that it

involves a highly complex and rapidly evolving market, but the posture in which this Court

undertook the remedy phase (and the Settling States negotiated their consent decree) was also

unique because the D.C. Circuit's liability opinion strictly cabined the parameters of an

appropriate remedy.  The actual remedy encompassed by the Settling States' consent decree and

the Litigating States' judgment was similarly unique, including innovative approaches such as the

TC and the technical documentation requirements.  Even within that unique remedy, Section III.E

represented the "*most* forward-looking" and most innovative provision.  *Remedy Opinion*, 224 F.

Supp. 2d at 173.  The Court's conclusion that the Expiring Provisions of the Final Judgments

should be extended is thus based on Section III.E's paramount significance in the Final

Judgments' scheme.  Section III.E was the cornerstone of the Court-ordered and Court-approved

remedies and, as the Final Judgments' most forward-looking provision, was the basis on which

the parties and the Court aspired to have the applications barrier to entry broken down over time.

The Court does not dispute that Microsoft has been overwhelmingly cooperative with the

Plaintiffs and the TC over the past five years.  To the contrary, the Court commends Microsoft for

its willingness to address issues as they arose and to negotiate solutions rather than force

litigation.  In many respects, Microsoft's conduct has been a model for parties engaged in

complex and protracted litigation.  But Microsoft's good citizenship does not erase the fact that,

more than five years after the Final Judgments called for the Section III.E Communications

Protocols to be available, licensees do not yet have the benefit of a certifiably complete, accurate,

and useable set of technical documentation.  Nor can the fact that Microsoft has never been found

to be out of compliance with the Final Judgments obscure the obvious conclusions that,

practically speaking, Microsoft has failed to comply with Section III.E, and that its non-

compliance is highly material.  Indeed, Microsoft admitted as much when, in May of 2006, it

admitted that it "didn't have the exact right resources [or] the right process in place," and

suggested a massive overhauling of the previous attempts at generating the technical

documentation required under Section III.E.  5/17/06 Status Hrg. Tr. at 39:3-8.

As discussed above, neither the parties nor the Court will ever know how the relevant

market might have developed if the Section III.E technical documentation had been available five

years ago.  Nor can the Court project what use may be made of the technical documentation in the

future.  But the Moving States have proffered realistic examples of ways in which the Expiring

Provisions of the Final Judgments can yet play a role in maximizing the impact of products to be

developed under Section III.E.  In light of Microsoft's admitted culpability in the Section III.E

delay, the Court concludes that it is not inequitable to extend the Expiring Provisions in order to

allow the provisions of the Final Judgments to operate together as originally envisioned.

      D.     *The Appropriate Length of the Extension*

      The sole remaining issue, then, is the length of time for which the California Group and

New York Group Final Judgments should be extended.  The Moving States seek to extend the

entire Final Judgments–the Expiring Provisions as well as Section III.E–until November 12, 2012.

Although the Moving States raise a number of arguments in support of this request, the Court

ultimately agrees with Microsoft and the United States that it is premature at this time to consider

extending Section III.E, and the Expiring Provisions, beyond November 12, 2009, given that

Section III.E has already been extended until that date.

      The Moving States first attempt to rehash the Litigating States' argument that "ten years is

the standard term for antitrust consent decrees entered into by the Antitrust Division of the United

States Department of Justice."  *Remedy Opinion*, 224 F. Supp. 2d at 184; CA Mem. at 18.

According to the Moving States, it is now appropriate for the Court to revert to the "standard"

term, by adding another five years to the Final Judgments' current five-year terms, because the

pace of change in the relevant market has not materialized as the Court envisioned during the

remedy proceedings.  The Court is no more convinced by this argument now than it was then, and

declines to accept the Moving States' disputed representations as to the "pace of change."  As

discussed above, because the Court's expectations of change in the relevant market were not tied

to any particular benchmarks, but rather recognized the "substantial uncertainty as to the future

demands of the software industry," *Remedy Opinion*, 224 F. Supp. 2d at 183, the Court cannot

conclude that its expectations in that respect have not been realized.  Furthermore, using the pace

of change in the market for Intel-compatible PC operating systems, with its unpredictability and

susceptibility to various forces, as the measure of whether to extend the Final Judgments would

inappropriately open the door to potentially limitless extensions of the Court's oversight.

The Moving States present a far more compelling argument when they assert that

"continued oversight by plaintiffs, the TC, and the Court, is essential to assure the integrity of the

MCPP," as well as "to give prospective licensees the confidence that the [technical

documentation] they will get, if they take a license, is complete and accurate."  CA Mem. at 12.[33]

The Court is certainly concerned with maximizing the procompetitive impact of the Final

Judgments and encouraging continued innovation that serves to eliminate the applications barrier

to entry.  The Court also recognizes that developing a product under an MCPP license "requires

considerable advance planning, capital investment and other expenditure[s]," *id.*, and appreciates

the significant role the TC plays in ensuring that the technical documentation produced pursuant

to Section III.E is of a nature and quality that is attractive and useful to current and prospective

licensees.  Nevertheless, the Court agrees with Microsoft and the United States that it is premature

---

[33] To this end, the Moving States assert that "there are continuing questions not just about the accuracy of the [technical documentation], but whether the [technical documentation] is complete," citing the results of the first audit triggered by Microsoft's conclusion in early 2007 that additional protocols should be added to the MCPP.  CA Mem. at 10-11.  As Microsoft notes, however, "Microsoft and the TC recently adopted a set of modest recommendations following the TC's analysis of the [consulting firm's report] that were substantially different from the [firm's] recommendations."  MS Opp'n at 14 n.7.  Microsoft further asserts that, to the best of its knowledge, "the agreement between Microsoft and the TC resolved the few issues raised by the [consulting firm's] report that the TC deemed necessary to address."  *Id.*  It therefore appears that any outstanding issues relating to the completeness of the technical documentation are being addressed in an appropriate manner.

at this point to extend the Final Judgments through 2012 based on the Moving States' speculation that the delays in the implementation of Section III.E will persist. *See* CA Mem. at 11. From all reports, it appears that Microsoft has finally committed the resources necessary, and adopted an approach likely to produce technical documentation that is complete, accurate, and usable to licensees. In light of the current RESET plan schedule and the parties' most recent reports, the Court is unaware of any reason that the technical documentation required by Section III.E should not be complete, accurate, and usable to licensees long before Section III.E expires.[34]

Moreover, for the time being at least, the oversight of the TC, the Plaintiffs, and the Court is assured, because Section III.E and the other extended provisions do not expire until November 2009. Parties considering licenses should therefore take comfort in the fact that the TC, the Plaintiffs, and the Court's oversight will continue while the technical documentation is tested and finalized. In addition, as the Moving States note, because "present and future client/server [Communications Protocols] are available for license through November 11, 2012," Microsoft "will be required to document" any "new [Communications Protocols] in its next major Windows client and server releases." CA Mem. at 11. Thus, the current oversight period of the Plaintiffs, the TC, and the Court also encompasses the launch of Microsoft's Windows Server 2008, which is reportedly scheduled for release in February 2008. *Id.*

Finally, the Moving States argue that "a five-year extension of the existing decree does no more than was originally intended by the parties and by the Court. . . [but rather allows] the decree

---

[34] Indeed, in the unlikely event that the proceedings to this point have not provided Microsoft with sufficient incentive to speedily produce certifiably complete, accurate, and useable technical documentation, this extension of the Expiring Provisions of the Final Judgment should certainly spur Microsoft to do so.

74

[to] be in effect, together as intended, for five years." Moving States' Reply at 18. This argument certainly has appeal, given the Court's conclusion that an extension of the Expiring Provisions is warranted because the unforeseen Section III.E delay has prevented the provisions of the Final Judgments from working in tandem. Indeed, the *United Shoe* standard suggests that the Court would be justified in extending the entire Final Judgments until November 12, 2012 in order to "accomplish [their] intended result." *See Western Electric*, 46 F.3d at 1202; *United Shoe*, 391 U.S. at 251-52. *Rufo*, however, counsels a more measured approach, requiring that any modification to a consent decree be "suitably tailored to the changed circumstances" that warrant the modification. *Rufo*, 502 U.S. at 383. In that regard, it is significant that Section V.B of the Final Judgments–which was negotiated as part of the Settling States' consent decree and included in the Court-imposed Litigating States' remedy–only contemplates a one-time extension of up to two years upon a finding of "a pattern of willful and systematic violations." *See* Final Judgments, Section V.B. Although Section V.B does not govern the Moving States' request, it nevertheless suggests that a five-year extension of the Final Judgments absent a finding of non-compliance is not "suitably tailored."

The Court thus concludes that the most appropriate approach is to assess the need for continued Court oversight in reasonable incremental periods. Section III.E and the other extended provisions are currently set to expire on November 12, 2009. *See* Modified Final Judgments, Section V.A. That extension was sought jointly by the Plaintiffs and Microsoft in order to ensure that Section III.E be given a full opportunity to succeed. *See* NY/MS Joint Mot. to Modify the Final Judgment at 2. As discussed extensively above, the Final Judgments were always intended to operate as a comprehensive remedy, and the Moving States have presented realistic examples

of ways in which the Expiring Provisions may yet be necessary to support, and maximize the impact of, Section III.E.  On that basis, the Court concludes that an extension of the Expiring Provisions until November 12, 2009 is likewise appropriate to "ensur[e] that the remedies included in the Final Judgment will have their full intended effect."  *Id.* at 1.  However, the extension of the Expiring Provisions is only warranted due to the change in circumstances brought about by the extreme delay in the implementation of Section III.E, and that provision currently remains in effect until November 12, 2009.  As such, the Moving States' request for a five-year extension appears premature, and rather than speculate as to the possible state of the technical documentation at that point in time, the Court shall make the Expiring Provisions coterminous with Section III.E.

Nevertheless, the Court's decision not to extend the Final Judgments beyond November 12, 2009 now does not foreclose the possibility of doing so in the future.  Indeed, the mechanisms are already in place to reexamine Section III.E's implementation and the Final Judgments' termination in the Fall of 2009.  At present, the Final Judgments give Plaintiffs the right "in their sole discretion to request an additional three-year extension of [Sections I, II, III.F.1, III.F.3, III.E, III.I, III.J, IV, V, VI, VII, and VIII] of the decree until November 12, 2012," with the understanding that "Microsoft will not oppose any such request."  NY/MS Joint Mot. to Modify the Final Judgment at 2-3.[35]  Similarly, the door remains open for the Court to reassess the need

---

[35] In addition, as noted above, Microsoft has agreed that "even if the Final Judgments expire completely in November 2009, it will continue, through November 11, 2012, to make the protocols included in the MCPP available for license on reasonable and non-discriminatory terms with a term of at least five years."  5/12/06 JSR at 10.  As a result of this commitment, "industry members will effectively have the ability to license protocols through at least November 11, 2017."  *Id.*

for continued oversight as the expiration of the Final Judgments in November 2009 approaches.

At that point, certifiably complete, accurate, and useable technical documentation will,

presumably, be available to licensees, and the Court will be in a far better position to evaluate

Section III.E's implementation, as well as the role that the other provisions of the Final Judgments

play in supporting Section III.E.

Based on the showing made by Moving States,[36] the Court concludes that they have met

their burden of establishing that the unforeseen delay in Section III.E's implementation constitutes

changed circumstances.  The Moving States have further established that the repercussions from

the delay have impacted the Final Judgments' procompetitive potential and prevented them from

achieving their principal objectives.  As such, the Court shall extend the Expiring Provisions until

November 12, 2009, to coincide with the current termination of the provisions that have already

been extended, and to allow the Expiring Provisions the opportunity to help maximize Section

III.E's potential.  In so doing, however, the Court reiterates that, as stated in its *Remedy Opinion*,

"[a]n antitrust decree should endure only so long as necessary to ensure competition."  *Remedy*

*Opinion*, 224 F. Supp. 2d at 184.  The Court certainly anticipates that there will, and must, be

---

[36] The Court is aware that in *Hughes v. United States*, 342 U.S. 353 (1952), the Supreme Court concluded that a District Court was within its power to modify a consent decree "after a proper hearing." *Id.* at 357-58.  The Court notes, however, that its resolution of the Moving States' motions does not depend upon any disputed facts that might require an evidentiary hearing.  Furthermore, the parties were provided a complete hearing on the issues raised in the Moving States' motions through their pleadings and, where the Court identified additional areas requiring consideration, it sought further briefing from the Moving States and allowed Microsoft sufficient time to respond to that briefing.  In light of the parties' thorough handling of the relevant issues in their pleadings, the Court concluded that oral argument would be redundant, and was therefore not warranted given the tight schedule for resolution of the Moving States' motions imposed by the parties and the Court.

finality to its oversight of the Final Judgments.

## IV:  CONCLUSION

For the foregoing reasons, the Court shall GRANT-IN-PART and DENY-IN-PART the

Moving States' motions to extend the Final Judgments, and shall extend the Expiring Provisions

of the Final Judgments, with the exception of Section III.B, until November 12, 2009.


Date:   January 29, 2008

                                                _/s/_____
                                                COLLEEN KOLLAR-KOTELLY
                                                United States District Judge

78